ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN (*pro hac vice to be filed*)
VINCENT M. SERRA (#243155)
SKYLER J. SANDS (*pro hac vice to be filed*)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (#213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

[INSERT] DIVISION

| | |
|---|---|
| JOHN KELLEHER, DEANNE GOLDEN, JAMES ALBERT, THE BERGER SIBLINGS TRUST, JOHN WILLIAMS, JAMES ROTTKAMP and JAMES SCOTT, individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GOLDEN GATE PRIVATE EQUITY, INC., NASSAU FINANCIAL GROUP, L.P., NASSAU INSURANCE GROUP HOLDINGS, L.P., and DAVID C. DOMINIK,<br><br>Defendants. | Case No. [Insert]<br><br><u>CLASS ACTION</u><br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS


Page

I. PRELIMINARY STATEMENT ....... 1
II. JURISDICTION AND VENUE ....... 7
III. PARTIES ....... 8
  A. Plaintiffs ....... 8
  B. Defendants ....... 11
IV. FACTUAL ALLEGATIONS ....... 12
  A. Phoenix and PHL ....... 12
  B. Golden Gate and Nassau's Takeover of Phoenix ....... 14
  C. Defendants Engaged in Financial Alchemy to Mask Known Risks to Plaintiffs and Class Members ....... 19
    1. The Captive Reinsurance and XOL Scheme ....... 23
      a. Concord Re ....... 23
      b. Palisado Re ....... 27
    2. The STOLI Buyback Scheme ....... 28
    3. Golden Gate and Nassau Terminate PHL's Capital Backstop and Thrust the Company into Run-off ....... 31
    4. Golden Gate and Nassau "Deconsolidate" PHL from Nassau and Drive the Company Over the Brink ....... 32
  D. KPMG's Certifications Further Obfuscate PHL's Rapidly Deteriorating Condition ....... 37
  E. The Rehabilitation ....... 38
  F. Defendants Misled Plaintiffs and Class Members Regarding PHL's Financial Instability and the Imminent Threats to Their Policies ....... 41
  G. Defendants Knew PHL Was Failing and that Their Own Misconduct Deceived Plaintiffs and Class Members ....... 49
V. CLASS ACTION ALLEGATIONS ....... 52
VI. THE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS ....... 56
VII. CAUSES OF ACTION ....... 58
  COUNT I ....... 58

**Page**

Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c)-(d), Against All Defendants....58

COUNT II....65

Fraudulent Concealment, Against All Defendants....65

COUNT III....68

Negligent Misrepresentation, Against Golden Gate and Nassau....68

COUNT IV....70

Violations of California Civil Code §§1709, 1710(4), Promissory Fraud, Against All Defendants....70

COUNT V....73

Violation of California Business and Professions Code §17200, *et seq*., Against Golden Gate and Nassau....73

COUNT VI....74

Violations of New York General Business Law §349, Against Golden Gate and Nassau....74

COUNT VII....76

Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, *et seq*. Against All Defendants....76

COUNT VIII....78

Violations of Connecticut Unfair Trade Practices Act, Connecticut General Statutes §42-110(a) *et seq*., Against Golden Gate and Nassau....78

VIII. PRAYER FOR RELIEF....81

IX. DEMAND FOR JURY TRIAL....81

John Kelleher, Deanne Golden, James Albert, The Berger Siblings Trust, John Williams, James Rottkamp, and James Scott (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), by and through their undersigned counsel, bring this action against Golden Gate Private Equity, Inc. ("Golden Gate"), Nassau Financial Group, L.P. ("NFG"), Nassau Insurance Group Holdings, L.P. ("NIGH") (together with NFG, "Nassau"), and David C. Dominik ("Dominik") (collectively, "Defendants") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the common law, and California, New York, Illinois, and Connecticut state consumer protection and/or statutory laws. Based on personal knowledge as to Plaintiffs' own acts and experiences, and on information and belief as to all other matters, including counsel's investigation, research, and review of press reports, statutory financial statements and other public reporting, regulatory filings, Plaintiffs' policy and annuity-related materials, and litigation and other proceedings related to Defendants and PHL (defined below), Plaintiffs allege as follows:

## I. PRELIMINARY STATEMENT

1. This case arises from Defendants' scheme to defraud and otherwise mislead Plaintiffs and Class Members – those who acquired rights to life insurance policies and/or annuity contracts issued by PHL Variable Insurance Company ("PHL," or the "Company"), including those carrying "Phoenix" branding from PHL's former parent, The Phoenix Companies, Inc. ("Phoenix"),[1] with benefits in excess of applicable state guarantee association ("SGA") limits, or other limits on death claims or for annuities specified in, or implemented by, PHL's pending Rehabilitation (defined below) (the "Payment Limits") – about the existential risks associated with Plaintiffs' and Class Members' policies, including PHL's inability to pay claims or honor its commitments due to Defendants' own exploitation of PHL and the concealment of PHL's looming implosion.

[1] These policies and contracts are referred to herein as the "policies," except where the context otherwise requires, or the "Phoenix Products."

2. One of the oldest life insurers in the United States, Phoenix sold life insurance and annuities to individuals and families seeking long-term financial security in retirement or after the loss of a loved one. But in 2016, Golden Gate – the California-based private equity firm led by defendant Dominik and notorious for engineering the asset-stripping scheme which caused the financial downfall of Red Lobster – acquired Phoenix and its insurance subsidiaries (including PHL) through Golden Gate's newly-created insurance subsidiary, Nassau (the "Acquisition"). To win approval of the deal, Defendants assured regulators and the public that their backing would, *inter alia*, "accelerate the company's turnaround, ***bolster its financial strength and ratings and benefit policyholders***," and "have a positive impact on the organization's ability to meet the needs of its policyholders."[2] Golden Gate and Dominik, through Nassau, also backed that promise with a written commitment – detailed in a capital maintenance plan ("CMP") – to keep PHL's risk-based capital ("RBC") ratio (a measure of financial strength relative to regulatory risk requirements) at or above 400%, and to provide capital support to the Company if it ever fell short of that level.

3. Rather than keep those promises, however, Defendants devised a scheme to deceive Plaintiffs and Class Members, including by, *inter alia*: (a) executing billions of dollars in circular, non-arm's length reinsurance transactions designed to mask PHL's mounting financial distress; (b) terminating PHL's previously agreed-to capital backstop; (c) insulating Golden Gate and Nassau from PHL's mounting liabilities (which effectively operate as promises to pay policyholders) by "deconsolidating" it from Nassau; and (d) issuing routine communications to Plaintiffs and Class Members that concealed the devastating risks to their Phoenix Products resulting from PHL's rapidly deteriorating financial condition (which was ***caused*** in substantial part by Defendants themselves). All the while, Defendants profited at the expense of the very policyholders they promised to support, including by earning administrative and asset-management fees for servicing the Phoenix Products and leveraging policyholder payments to generate reinsurance and investment income.

---

[2] All emphasis in quotations is added unless otherwise indicated.

4. In recent years, insurers – particularly private equity-owned insurers – have begun offloading policyholder obligations to ***their own*** affiliated "captive" reinsurance (effectively, insurance for insurers) companies located in jurisdictions where financial statements are not made public. This maneuver not only "eliminate[s] the outsider perspectives and checks that third-party reinsurers provide[,]"[3] but is designed to mask an insurer's true financial status, keeping policyholders and annuitants in the dark about increased risk to their life and annuity products. Following the Acquisition, Defendants took a page out of this playbook – popularized by Apollo Global Management Inc.'s creation of Athene in 2009 – by shifting billions of dollars of policyholder obligations into captive reinsurers that allowed them to benefit at the expense of Plaintiffs and Class Members.

5. For example, beginning in 2019, Defendants transferred all of PHL's retained insurance liabilities to captive insurers and other affiliates that valued a ***contingent promise*** on PHL's balance sheet at $450 million, and booked it as an "admitted asset" – *i.e.*, as if it were cash in the bank and "available" to pay PHL policyholder claims – even though the asset was not available, rendering it effectively "worthless."[4] The maneuver inflated PHL's reported RBC ratio from 240% to 346% in a single year. When state regulators finally cash flow-tested the captives in 2024, ***$1.3 billion*** in hidden losses suddenly surfaced at once. Unsurprisingly, this tactic not only violated Statutory Accounting Principles and the position of the National Association of Insurance Commissioners ("NAIC"), but also runs afoul of many states' insurance laws, including rules requiring affiliate transactions to be fair, reasonable, and adequately disclosed, and capital surplus to reasonably cover liabilities. This is also why Defendants exploited more permissive offshore jurisdictions and their captives and affiliates were domiciled largely in Connecticut, Vermont, Europe, and the Cayman Islands.

---

[3] *When Wall Street's Insurance Playbook Goes Wrong,* BLOOMBERG (updated Nov. 18, 2025), available at: https://www.bloomberg.com/features/2025-america-insurance-part-2/ (attached hereto as Exhibit A and referred to herein as "Ex. A").

[4] *She paid an insurance company $99,000 to generate retirement income for life. Then It collapsed.*, NBC NEWS (May 20, 2026), available at: https://www.nbcnews.com/news/us-news/paid-insurance-company-99000-generate-retirement-income-life-collapsed-rcna331934.

6. Also in 2019, Nassau and Golden Gate terminated their commitment to provide capital support to PHL, replacing it with a one-time capital infusion and an assurance that PHL would meet an RBC ratio of only half the amount originally promised. By the beginning of 2020, PHL ceased issuing new policies and Defendants placed the Company into run-off, which cut off new business that could replenish surplus, while continuing to solicit premiums from existing policyholders and annuitants without disclosing the growing risk to their benefits.[5] Then, at year-end 2021, Golden Gate and Dominik transferred PHL out of the Nassau corporate structure entirely, removing what little capital support obligations remained. Yet Nassau continued to collect millions of dollars for policy servicing and asset management related to the Phoenix Products. With no backstop to refill PHL's tank if its RBC ratio continued trending in the wrong direction, Defendants ran PHL as a shell company that gave Plaintiffs and Class Members a false sense of security.

7. Indeed, as later acknowledged by the Connecticut Insurance Commissioner (the "Commissioner"), Nassau materially misrepresented PHL's financial position and artificially inflated the Company's financial statements by allowing PHL to operate with insufficient reserves. As noted by financial fraud and industry experts, this financial alchemy created a massive $2.2 billion "black hole" within PHL's balance sheet, ***designed to artificially inflate the Company's financial stability while masking its deteriorating solvency***.

8. As a result, on May 20, 2024, the Commissioner instituted a rehabilitation proceeding in Connecticut Superior Court, *Insurance Commissioner of the State of Connecticut v PHL Variable Insurance Company et al.*, Case No. UWY-CV24-6085274-S (the "Rehabilitation"), which began to shine a light on Defendants' misconduct. But under a Moratorium Order issued by the Court in the Rehabilitation, Plaintiffs and Class Members are unable to receive the full benefits due under their policies, nor can they exchange, surrender, or withdraw the cash value of their Phoenix Products.

---

[5] "Premiums," as referenced throughout the complaint, includes "deposits" and other payments made to maintain or fund the Phoenix Products.

9. Defendants, through Nassau, perpetuated the illusion of PHL's financial health by issuing routine policyholder and annuity statements, demanding premiums "due," and communicating with insureds as though PHL remained a solvent, fully capitalized insurer, long after Defendants knew the Company was financially doomed to fail. Through these communications, Defendants induced Plaintiffs and Class Members to maintain their policies, despite knowing that PHL was cratering and destined to fail. Even after PHL was thrust into Rehabilitation, Defendants continued sending communications to Plaintiffs and Class Members seeking payment to maintain their policies while omitting that such payments could not assure that their benefits would be honored above the Payment Limits (even if Class Members were notified of the Rehabilitation). Had Defendants not concealed the material risk threatening Plaintiffs' and Class Members' policies, they could have, for example, withdrawn the cash value in full or performed a "1035 exchange" – an IRS provision allowing a policyholder or annuitant to transfer funds from an existing policy or contract to an alternative policy or contract (from a solvent or better-capitalized insurer).

10. And there is no relief in sight, as the Rehabilitation has since transitioned into a slow-moving liquidation proceeding. Following a liquidation order, Class Members' policies will terminate, leaving them with, at best, benefits capped by the Rehabilitation or SGAs – typically $300,000 for death benefits and $250,000 for annuities – frequently hundreds of thousands if not millions of dollars short of the benefits for which they contracted. As Thomas Gober, a certified fraud examiner who has briefed Congress about growing concerns over life insurance company practices, concluded: "[t]he impact of PHL's sham reinsurance with its wholly owned captives ***caused significant harm to policyholders*** and substantially delayed regulatory action by the Connecticut Insurance Department ("CID"), further exacerbating harm to policyholders."

11. Since the Acquisition, Nassau has grown to $24.4 billion in assets under management and $1.6 billion in capital, while continuing to run PHL's day-to-day operations – servicing more than 62,000 PHL policies, including life insurance policies carrying over $22 billion in aggregate death benefits as of the end of 2025. Meanwhile, PHL's capital surplus – a critical metric for insurance companies representing the ability to both pay its claims and remain

solvent – fell from $239 million at the time of the Acquisition to $85 million by 2022, turned negative in 2023, and collapsed to negative $2.1 billion once regulators looked behind the curtains in 2024. It now stands at approximately ***negative $2.3 billion***.

12. The following chart depicts the precipitous decline in PHL's capital and surplus at the expense of Plaintiffs' and Class Members as Defendants lined their pockets (and Nassau doubled its wealth) and executed their scheme to defraud and conceal the truth about PHL's downfall:




13. Plaintiffs seek damages and equitable relief on behalf of themselves and the Class, including, but not limited to: (1) actual, compensatory, consequential, statutory, treble, and punitive damages, including damages measured by the lost value or benefits of Plaintiffs' and Class Members' Phoenix Products in excess of the Payment Limits; (2) premiums and charges Plaintiffs and Class Members paid, and the value of the surrender, withdrawal, and exchange options they lost; (3) restitution of amounts wrongfully obtained by Defendants from Plaintiffs and the Class; (4) pre- and post-judgment interest; (5) attorneys' fees and costs; and (6) such further relief as the Court deems just and proper. Plaintiffs seek this relief based solely on their own direct claims against Defendants for misconduct directed at Plaintiffs and do not assert claims belonging

to PHL or its subsidiaries in Rehabilitation, or seek recovery from, or control over, estate assets as defined in the Rehabilitation.

## II. JURISDICTION AND VENUE

14. This Court has federal subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2)(A) and (d)(6), because this is a class action with more than 100 Class Members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and minimal diversity exists because at least one Class Member is a citizen of a state different from at least one Defendant.

15. The Court also has subject matter and federal question jurisdiction of this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964(c), because Plaintiffs' claims arise under the RICO statute, 18 U.S.C. §1961, *et seq*.

16. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. §1367 because those claims form part of the same case or controversy under Article III of the United States Constitution as Plaintiffs' federal RICO claim.

17. This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A), 18 U.S.C. §1965(a), (b) and (d), and applicable California long-arm principles. Defendants have sufficient contacts with California and this District because, among other things, Golden Gate is headquartered in San Francisco, and Dominik, its Founder and Managing Director, directed or participated in the challenged conduct from Golden Gate's San Francisco headquarters in this District. Additionally, Defendants transacted business in California, communicated with California policyholders and annuitants, and committed or caused violations of California statutes, the RICO statute, and/or common law in whole or in part in California. To the extent necessary, the ends of justice require the exercise of RICO personal jurisdiction over all Defendants in a single action because Plaintiffs' RICO claims arise from a single, integrated nationwide scheme involving Golden Gate, Nassau, Dominik, PHL, and the Nassau Affiliates (defined below).

18. At all material times, Defendants intentionally availed themselves of the laws of the United States, California, and of the Northern District of California by transacting substantial business throughout the United States and California, including but not limited to, directing,

causing, or participating in communications and business transactions with PHL policyholders and annuitants in the United States and California.

19. Defendants maintained significant California-facing insurance and annuity operations during the Class Period (defined below). In 2024 alone, Defendants collected more than $150 million in California premiums, including approximately $136.8 million in annuity considerations and approximately $13.4 million in life insurance premiums.[6]

20. The activities of Defendants had a substantial effect on interstate commerce.

21. Venue is proper in this District pursuant to 18 U.S.C. §1965(a) and 28 U.S.C. §1391(b)(1)-(2) because Defendants reside, are found, have an agent, and/or transact their affairs in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including conduct that Golden Gate and Dominik directed or controlled from Golden Gate's San Francisco office in this District, and communications and transactions involving Plaintiffs and Class Members in California, including plaintiff Kelleher.

## III. PARTIES

### A. Plaintiffs

22. John Kelleher ("Kelleher") is a resident and citizen of California who held rights associated with a Phoenix Estate Legacy 4 universal life ("UL") second to die policy procured against the lives of his parents, John Sr. and Diane Kelleher, with benefits in excess of applicable Payment Limits as of May 20, 2024. Kelleher and his sister were the owners and beneficiaries of the UL policy that was issued in January 2008 with an initial face value of $3 million. Kelleher and his sister paid in excess of $700,000 in premiums and expected to receive approximately $3 million in total death benefits following the death of their mother Diane, in April of 2026. Nassau repeatedly sent Kelleher invoices for quarterly premiums due in the amount of $6,000. Notwithstanding these premiums, Nassau deducted additional cost of insurance ("COI") charges for insurance coverage that Nassau knew was impaired, repeatedly put the policy into

---

[6] California Department of Insurance, California Life & Annuity, 2024 Market Share Report (June 2025), available at: https://www.insurance.ca.gov/01-consumers/120-company/04-mrktshare/2024/upload/LifeMktShr2024.pdf, at 12, 14.

"grace," which triggered additional payments, and elicited additional fees and charges that were not explained to Kelleher. Capped by the Payment Limits, Kelleher and his sister received approximately $150,000 each following Diane Kelleher's death in April 2026 ($2.7 million short of the total death benefits).

23. Deanne Golden and James Albert (the "Albert Siblings") are siblings that hold rights associated with two Phoenix Estate Legacy UL policies procured against the lives of their parents, William and Nina Albert, with benefits in excess of applicable Payment Limits as of May 20, 2024. Deanne Golden is a resident and citizen of New York, and James Albert is a resident and citizen of Colorado. The Albert Siblings' policies were purchased in December 2001, each with an initial face value amount of $3 million, and expected to receive approximately $6 million in total death benefits. The Albert Siblings, along with their other policy co-owner, paid annual premiums totaling $197,074 and their records reflect fees and charges of over $206,148 for the policy year ending December 21, 2025 for one policy, and paid premiums totaling $238,661 and their records reflect fees and charges of over $213,875 for the same year on the other policy. Capped by the Payment Limits, the Albert Siblings and their policy co-owner received a total of approximately $300,000 following the death of William Albert on June 1, 2026 ($5.7 million short of the total death benefits).

24. Plaintiff The Berger Siblings Trust is an Illinois trust that owns a $10 million PHL UL policy (the "Berger Policy") with benefits in excess of applicable Payment Limits as of May 20, 2024. Since purchasing the Berger Policy in 2008, The Berger Siblings Trust has paid premiums in excess of $2 million towards maintenance of this policy. Despite the Berger Policy's "policy protector rider," a policy feature meant to automatically prevent a policy from lapsing when its premiums or cash value is insufficient to cover monthly charges, The Berger Trust has continued to receive regular "premium due" notices from Defendants both before and following the Rehabilitation.[7]

---

[7] *See infra* ¶¶106-110.

25. Plaintiff John Williams ("Williams") is a resident and citizen of Connecticut who held rights associated with a variable annuity contract issued on January 22, 1997, under a prospectus and known as PHL Variable Big Edge Choice.[8] The stated value of Williams' annuity contract was significantly in excess of the Moratorium cap as of May 20, 2024. Williams paid an initial premium of $15,000 for his annuity contract, and, in total, has paid over $416,987 in premiums. Williams cannot annuitize his account and cannot withdraw any funds from his account.

26. Plaintiff James Rottkamp ("Rottkamp") is a resident and citizen of Connecticut who has owned three Phoenix Products with benefits in excess of applicable Payment Limits as of May 20, 2024: one twenty-year, $2 million term life policy, purchased in 2007; one $500,000 UL policy, purchased in 2012; and one $250,000 UL policy, purchased in 2002. Rottkamp has paid more than $120,000 in premiums towards maintenance of these three policies. Rottkamp terminated his term life policy in March 2025, once he learned of the Rehabilitation and Moratorium Order.

27. Plaintiff James Scott ("Scott") is a resident and citizen of Ohio that holds rights associated with two PHL annuity contracts (for annuity products known as Phoenix Personal Protection Choice)[9] valued in excess of applicable Payment Limits as of May 20, 2024. As of the Rehabilitation, Scott's contracts held death benefit values of over $330,000 in total. Since the purchase of the contracts in 2014, Scott has paid more than $200,000 towards maintenance of his annuity contracts. Scott's annuity contracts also provided long term care benefits designed to last for Scott's lifetime. These benefits are currently frozen, capped, or materially restricted, and will be dramatically reduced following a final order of liquidation and the replacement cost of such long term care benefits is prohibitive.

---

[8] The "Big Edge Choice" is a deferred variable accumulation annuity contract option issued by PHL to select investing groups and individuals, including plaintiff John Williams. *See* https://www.sec.gov/Archives/edgar/data/934344/000119312510101358/d485bpos.htm.

[9] The Phoenix Personal Protection Choice (later renamed the Nassau Personal Protection Choice) is a single-premium fixed indexed annuity whose core feature is external index ties (like the S&P 500 or Nasdaq), meant to protect an invested principle against shorter-scale market volatility.

**B. Defendants**

28. Defendant Golden Gate is a San-Francisco, California-based private equity firm incorporated in Delaware and headquartered at One Embarcadero Center in San Francisco, California. Defendant Dominik is the principal owner of Golden Gate. Golden Gate made an equity commitment of $750 million to Nassau in 2015, and continues to own and control Nassau and certain Nassau affiliates (including Nassau Re Cayman, defined below), including through affiliated investment funds. At the time the Rehabilitation was initiated, Golden Gate was the ultimate parent company of PHL Delaware LLC ("PHL Delaware"), a Delaware domiciled limited liability company, of which PHL was a wholly-owned subsidiary. By the beginning of 2024, Golden Gate had over $19 billion in cumulative committed capital. As of the end of 2025, Golden Gate managed over $11.1 billion in regulatory assets.

29. Defendant NIGH, previously known as Nassau Reinsurance Group Holdings, L.P. ("Nassau Re"), is a Delaware limited partnership headquartered at One American Row in Hartford, Connecticut. NIGH was launched in 2015 by Golden Gate with a $750 million equity injection in order to acquire Phoenix. Until 2021, NIGH directly owned PHL Delaware, of which PHL was a wholly owned subsidiary. In November 2021, NIGH transferred PHL Delaware to PHL Holdings, LLC, an entity wholly owned by Golden Gate-affiliated investment funds, thereby deconsolidating PHL from Nassau while leaving it under Golden Gate-affiliated ownership and control.

30. Defendant NFG is a Cayman Islands limited partnership headquartered at One American Row in Hartford, Connecticut. NFG became the upper-tier parent of NIGH in 2018, and its general partner is Nassau Financial Group GP Ltd. ("NFG GP"). NFG, together with defendant NIGH, participated in and exercised authority over the insurance, reinsurance, asset-management, administrative, and policy-servicing operations of both NIGH and NFG, collectively referred to herein as "Nassau." Nassau and the Affiliates[10] remain directly or indirectly owned or

---

[10] In addition to Nassau, Defendants established a number of Nassau affiliates, including Nassau Life Insurance Company, Nassau Life and Annuity Co., Nassau Re (Cayman) Ltd., The Nassau Companies of New York, Nassau Asset Management LLC, DSM Sands, LLC, Lifebrook Investments Designated Accounts Company, Westgate Delaware, LLC, Magni Re, Ltd., Lynbrook

controlled by defendant Dominik, through Golden Gate via NFG/NIGH, or Golden Gate's own affiliated investment funds.

31. Defendant Dominik is a Managing Director of Golden Gate in San Francisco, California, and, as the sole member of Golden Gate Capital Opportunity Fund, the controller of both Golden Gate and Nassau. As of the Rehabilitation, Dominik personally controlled The Nassau Companies of New York ("NCNY"), which is the immediate parent of Nassau Life Insurance Company ("NNY"), which Dominik also controlled through various entities, including defendant NIGH and NFG's general partner, NFG GP. Defendant Dominik has been the Chief Investment Officer, Founder, Managing Director, and sole director of defendant Golden Gate since co-founding the firm in 2000. In that role, Dominik has directed and/or controlled the activities of Golden Gate and its affiliates and/or subsidiaries, including the oversight and approval of numerous transactions described herein. Prior to his time at Golden Gate, Dominik served as a Managing Director at private equity firm Bain Capital.

## IV. FACTUAL ALLEGATIONS

### A. Phoenix and PHL

32. One of the oldest life insurance companies in the United States, the original predecessor of Phoenix was founded in 1851 as The American Temperance Life Insurance Company ("American Temperance") in Hartford, Connecticut. In 1860, American Temperance split and changed its name to Phoenix Mutual Life Insurance Company ("Phoenix Mutual") and created another predecessor entity, the Home Life Insurance Company ("Home Life"), formed in Brooklyn, New York, that would become the first personal life insurer authorized by the New York Insurance Department. In 1981, PHL was founded as a subsidiary of Phoenix Mutual. In 1992, Phoenix Mutual and Home Life re-merged to create Phoenix Home Life Mutual Insurance Company, which was then the 13th-largest mutual life insurance company in the country.

---

Re., Inc., and Sunrise Re, Inc. (collectively, the "Affiliates" or the "Nassau Affiliates," individually defined below). *See infra, e.g.*, ¶¶56, 62, 64, 71, 72, 81, 84.

33. In 2001, Phoenix converted from a mutual insurance company to a stock-based company, was renamed The Phoenix Companies, Inc., and was listed on the New York Stock Exchange ("NYSE") under the ticker symbol PNX. PHL became Phoenix's Connecticut-domiciled insurer and absorbed all non-New York, Maine, and Puerto Rico business operations of Phoenix at that time. At the time the Rehabilitation was initiated, PHL held a certificate of authority to transact insurance in 48 states, the District of Columbia, and Puerto Rico.

34. Phoenix historically maintained two business and operating segments: Life and Annuity and Asset Management. Relevant here, PHL was one of the principal operating insurers within Phoenix's Life and Annuity segment, which offered permanent life insurance - principally universal life (UL) and term life insurance. A UL policy is a permanent life insurance plan (which provides a lifelong death benefit) featuring flexible premiums and adjustable death benefits.[11] Excess premium payments build tax-deferred cash value for a holder, which earns interest and can be borrowed against. Term life insurance is a policy that provides for similar premiums, with a tax-free benefit paid upon the death of a policyholder only during a set 'term.'[12]

35. Phoenix's Life and Annuity business also sold deferred and immediate variable annuities, which are investment vehicles (usually used for retirement savings) which place funds in market-based subaccounts to provide fluctuating future payouts to function as income payments, based on market conditions. These variable annuities also may feature guaranteed interest accounts that guaranteed a minimum interest rate on the account value of the annuity contract. For this reason, many holders of Big Edge Choice, Phoenix/Nassau Personal Protection Choice, and

---

[11] UL policies, as referred to herein, also include variable universal life ("VUL") policies, which function like standard UL policies, but combine the lifelong death benefit component with a cash value component, which is invested in investment vehicle subaccounts for the beneficiary or rights holder.

[12] PHL offered both standard term life insurance and return of premium life insurance. A return of premium policy is an optional add-on or specific type of term life insurance that functions like a forced savings account: if the policyholder outlives the policy term, the insurance provider refunds the base premiums paid. If the policyholder passes away during the term, the beneficiaries to the policy instead receive the standard death benefit.

similar PHL annuities, including plaintiffs Williams and Scott, believed that the guaranteed interest account was safe and secure, insulated from market risk and risk of loss of principal.

36. Before late 2008, ratings agencies including AM Best, Moody's, S&P, and Fitch provided Phoenix with financial-strength ratings of A, A3, A-, and A+, respectively. The global financial crisis pushed most agencies to downgrade Phoenix to levels reaching B+ from A.M. Best, Ba2 from Moody's, and BB− from S&P by March 2012. As discussed below, PHL ceased underwriting and issuing new policies and annuity contracts at year-end 2019.

**B. Golden Gate and Nassau's Takeover of Phoenix**

37. Between September 18 and November 8, 2012, Phoenix announced that its previously issued audited financial statements for the years ended December 31, 2010 and 2011, along with the unaudited financial statements for quarterly periods dating back to March 31, 2011, could no longer be relied upon and would be restated. Phoenix listed two principal error categories as the cause, including the incorrect classification of deposits and withdrawals of UL and VUL products and the incorrect reporting of certain fees and interest charges as cash flows provided by financing activities. Phoenix also warned that "[m]anagement will likely conclude that there are one or more material weaknesses" in its disclosure controls and procedures and internal controls over financial reporting.

38. As a result, the Company's common stock price plummeted and ratings agencies uniformly downgraded Phoenix. To make matters worse, Phoenix also adjusted its accounting and posted losses again in 2015, causing the stock to tumble once more. From March 30, 2015, to May 15, 2015, alone, the stock plunged over 66%, from $56.07 to $17.85, on news of the financial restatements, losses in quarterly reports, and a $48.5 million settlement of a class-action lawsuit involving life insurance rate increases. As private equity firms increasingly sought to buy up struggling insurers during this period, one particular firm emerged as ready and willing to act.

39. Golden Gate was founded by former Bain Capital partner defendant Dominik in San Francisco, California in 2000, as a specialized private equity firm focused on leveraged buyouts, minority purchases, and growth capital transactions. By 2015, Golden Gate had more than $12 billion of committed capital under management. Golden Gate's other significant holdings

have included California Pizza Kitchen, Express, Romano's Macaroni Grill, J. Jill, and Red Lobster.

40. Most significant among these transactions, Golden Gate acquired Red Lobster in 2014 for $2.1 billion from Darden Restaurants. As part of the acquisition, Golden Gate sold the chain's extensive real estate portfolio in a sale-leaseback transaction for $1.5 billion, forcing each franchise to pay rent.[13] This added an unforeseen, massive additional cost to each location, further exasperated by rising commercial lease prices throughout the decade, and again in 2020 due to COVID-19. As a result, following Golden Gate's resale of the entity to Thai Union Group in 2020, the company announced Chapter 11 bankruptcy proceedings in May 2024.

41. NIGH, in turn, was founded as Nassau Re by Golden Gate and Dominik in April 2015 as a privately held insurance and reinsurance business focused on acquiring and operating entities in the life, annuity and long-term care sectors, and led by industry executives Phillip Gass (as the Chairman and CEO) and Kostas Cheliotis (as the Executive Vice President and Chief Operating Officer). In May 2015, Golden Gate, as a self-described "long-term" investor free from "liquidity constraints," made an equity commitment of $750 million to Nassau Re for planned acquisitions and "reinsurance transactions." Both Gass and Dominik made clear at the time that Golden Gate would be Nassau Re's "partner" in building the company's insurance and reinsurance businesses.[14]

42. On September 29, 2015, Nassau Re, with the backing of Golden Gate, announced the signing of a definitive agreement to acquire Phoenix for $37.50 per share in cash, representing an aggregate purchase price of $217.2 million (the Acquisition). On December 17, 2015, Phoenix shareholders approved the merger.

---

[13] A sale-leaseback is a financial transaction in which a company sells an asset—here, the land on which Red Lobster restaurants were located—to an investor and simultaneously leases it back under a long-term rental agreement. This allows the business to convert an illiquid asset into immediate working capital while maintaining operational control of the facility.

[14] *Nassau Reinsurance Group Raises Over $750 Million Of Initial Capital To Build Insurance And Reinsurance Platform*, GOLDEN GATE CAPITAL (May 13, 2015), available at: https://goldengatecap.com/nassau-reinsurance-group-raises-over-750-million-of-initial-capital-to-build-insurance-and-reinsurance-platform/.

43. Shortly before the Acquisition closed, Defendants made numerous material representations to the Commissioner (among other regulators), partially by means of an Amended and Restated Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer in May 2016. Specifically, Defendants assured regulators in the CMP that Golden Gate would provide capital support in connection with the operation of PHL's business and agreements so that PHL's RBC ratio would remain at, or above, certain limits tied to solvency.

44. As part of the CMP, Defendants agreed to keep PHL's authorized control level RBC ratio ("ACL-RBC") at or above 400%, promised to stabilize its balance sheet by funding $100 million of new capital, and represented that there were no plans to liquidate the Company, sell its assets, merge or consolidate with any other person or entity, or make other material changes in business operations or corporate structure or management. These assurances were reinforced by the representation that Nassau Re would provide PHL with additional capital support should these operating benchmarks not be met.

45. Management of all three companies – Phoenix, Nassau Re, and Golden Gate – additionally represented that the Acquisition would improve Phoenix's financials and benefit Plaintiffs and Class Members. For example, on or about September 29, 2015, James D. Wehr, President and CEO of Phoenix, said that the "additional capital provided by Nassau will make Phoenix and its subsidiaries ***financially stronger*** and well-positioned for the long term, ***to the benefit of policyholders***[.]"[15] Likewise, Phillip Gass, Chairman and CEO of Nassau,[16] said that the Acquisition would "accelerate the company's turnaround, ***bolster its financial strength*** and ratings and ***benefit policyholders***[.]"[17]

---

[15] *Nassau Re to Acquire The Phoenix Companies*, INSURANCE INNOVATION REPORTER (Sep. 30, 2015), available at: https://iireporter.com/nassau-re-to-acquire-the-phoenix-companies/.

[16] At the time of the Acquisition's announcement in 2015, Nassau Re was known simply as "Nassau."

[17] *Supra* n.15.

46. Also on that date, Phoenix filed a Talking Points and Q&As document with the SEC reiterating that the Acquisition would "***benefit***" ***policyholders*** "***over the long term,***" "further stabilize and grow [Phoenix's] business and improve its balance sheet," make the Company "financially stronger and is expected to enhance ratings," and "improve [its] growth prospects[.]"[18] Significantly, the document assured customers that Phoenix "will continue to maintain its business commitments" and "***will continue to pay policyholder claims as it has for 164 years***."[19]

47. In an April 19, 2016, public hearing at the CID, Wehr and Gass doubled down on their pronouncements. Wehr submitted pre-filed testimony proclaiming that the "proposed merger will be beneficial to Phoenix and its policyholders" and "will stabilize and improve Phoenix's financial condition and financial strength ratings, both of which will support Phoenix's longer term sales and growth plans."[20] Wehr elaborated that "[t]he policyholders of [Phoenix] will benefit . . . from the stability and financial strength that Nassau's capital infusion and business initiatives will bring about."[21] Likewise, Gass explained that the Acquisition "will position Phoenix for ***long term success***" and "will accelerate Phoenix's turnaround, ***substantially bolster its financial strength, ratings and risk-based capital ratios, and benefit policyholders***[.]"[22] Gass also made clear that Nassau, Golden Gate, and Dominik would not only acquire Phoenix, but would acquire and control Phoenix's domestic insurer entities, including PHL.

---

[18] Phoenix/Nassau Acquisition Announcement Talking Points and Q&As (Sep. 29, 2015), available at: https://www.sec.gov/Archives/edgar/data/1129633/000135448815004426/phnx_ex992.htm.

[19] *Id.*

[20] Statement of James D. Wehr, Proposed Acquisition of Control of PHL Variable Insurance Company, et al., by Davero Merger Sub Corp. et al., State of Connecticut Insurance Department, available at: https://www.catalog.state.ct.us/cid/portalApps/PDFs/D8tXef9Z6cB7JmJRcFWelwmUgnzeLZ.pdf.

[21] *Id.*

[22] Statement of Phillip Gass, *supra* ¶45.

48. Golden Gate CEO Stephen D. Oetgen concurred, stating, "[o]bviously, Golden Gate agrees with Mr. Gass and Mr. Wehr that Golden Gate's investment in Phoenix will have a ***positive impact on that organization's ability to meet the needs of its policyholders***."[23] Oetgen also assured the Commissioner that:

> ***Golden Gate's acquisition of a controlling interest in Phoenix would not in any way jeopardize the financial stability of [PHL] or prejudice the interest of its policyholders***. On the contrary, as we have indicated previously, we believe that our partnership with Phoenix will strengthen that institution financially. As part of the proposed acquisition and incremental to the merger consideration, Nassau will fund additional capital of at least $100 million, funded by Golden Gate under our existing commitment to Nassau. These funds will be infused into Phoenix to ***improve Phoenix's financial condition and ultimately will leave Phoenix in a much stronger financial position***.[24]

49. Additionally, Oetgen made clear that Golden Gate would "support" Nassau's "strategic vision" by "providing Nassau with the necessary capital to complete the merger and ***serving as a partner to Nassau***" in its operation of Phoenix and its domestic insurers.[25] Based at least in part on Golden Gate and/or Nassau's representations at the time, and their continued communications as if nothing significant about Phoenix's business operations had changed, Plaintiffs and Class Members believed that their Phoenix Products were safe and secure. For example, *Bloomber*g published a statement by plaintiff Williams stating that, "You would've thought, 'Oh my God, ***this company is bulletproof for the next 300 years***,' ***based on the way they were painting it . . . They were really pumping that***."[26]

50. By June 14, 2016, the state-level insurance department regulators in New York and Connecticut had provided final regulatory approval for the transaction, and on June 20, 2016, Golden Gate and Dominik, through Nassau, completed the Acquisition, whereby Nassau

---

[23] Statement of Stephen D. Oetgen, Proposed Acquisition of Control of PHL Variable Insurance Company, et al., by Davero Merger Sub Corp. et al., State of Connecticut Insurance Department, available at: https://www.catalog.state.ct.us/cid/portalApps/PDFs/D8tXef9Z6cB7JmJRcFWelwmUgnzeLZ.pdf.

[24] *Id.*

[25] *Id.*

[26] Ex. A, *When Wall Street's Insurance Playbook Goes Wrong*, *supra* n.3.

contributed $100 million of new equity capital into Phoenix, and Nassau's CEO, Gass, would serve as Phoenix's CEO. Following the Acquisition, Nassau announced that it planned to run Phoenix as a "going concern" with PHL serving as Nassau's US life and annuity platform.[27] As the Acquisition took Phoenix private, the Company was delisted from the NYSE, eliminating its public reporting requirements.

51. Subsequently, on August 25, 2017, S&P Global Ratings upgraded Phoenix/PHL's counterparty-credit and financial-strength ratings from BB- to BB, with a stable outlook, stating, "[t]he upgrade reflects our view of the company's advancement in its transformation and turnaround plan outlined to us upon acquisition by Nassau []. We believe, since acquisition, the management team has responded and made measurable progress on its business and financial plans, and more specifically those related to the resolution of financial restatements, material weaknesses, and outstanding litigation."[28]

### C. Defendants Engaged in Financial Alchemy to Mask Known Risks to Plaintiffs and Class Members

52. Historically, life insurers invest the capital from policyholders' premiums in high-quality stocks, bonds, residential mortgages, and other dividend-paying financial products so they could pay future policyholder obligations. Over the past two decades, however, private equity firms have rapidly purchased life insurance companies, reshaping the insurers' balance sheets to hold less capital, shifting insurance policy liabilities offshore, and buying more complex investment assets. Research from the International Monetary Fund ("IMF") has raised alarm bells about private equity-influenced life insurers with increased exposure to illiquid investments and the perverse incentives for the private equity firms to generate higher yields and profit from the

---

[27] A going concern is an accounting term for a business that is ***assumed to meet its financial obligations when they become due***. This conveys that the business will function without the threat of liquidation for the foreseeable future, which is usually regarded as at least the next fiscal year period.

[28] *Phoenix Life Insurance Group Upgraded To 'BB'; Outlook Stable*, S&P GLOBAL RATINGS (Aug. 25, 2017), available at: https://news.nfg.com/wp-content/uploads/2017/08/Phoenix-Research-Update-08.25.17.pdf.

increased spread earned on those investments.[29] As a result, these private equity-influenced life insurers can create an increased risk of default, bankruptcy, and credit downgrades, jeopardizing policyholders' security. Indeed, as the IMF research demonstrates, the private equity-backed insurers' ability to manage premiums and reinsure the insurance products – often through offshore-based reinsurers – "limit[s] the ability of on-shore regulators to monitor these activities."[30]

53. Insurance companies traditionally purchased reinsurance – essentially, insurance for insurance companies – from third parties, whereby a ceding insurer transfers risk to an independent assuming insurer, or 'reinsurer.' This compares to traditional reinsurance, which can help insurers and policyholders by transferring risk to an external third party, which improves underwriting by imposing cash flow testing and reporting requirements on the insurer seeking reinsurance (the 'ceding' company), and provides independent third-party capital untethered to the ceding insurer's business. In practice, reinsurance functions by creating a 'reinsurance recoverable' – an asset on an insurance company's balance sheet representing money expected from a reinsurer for both paid and unpaid claims.

54. But, as recently outlined by *Bloomberg*, "this century, a variation known as captive reinsurance has come into vogue. The idea is simple: An insurer sets up its ***own*** reinsurer and buys coverage from it to get balance-sheet relief. However, that can eliminate the outsider perspectives and checks that third-party reinsurers provide."[31] In these transactions: (1) risk never leaves the company's balance sheet (meaning there is no transfer of asset-related risk); (2) the assets backing the insurance company's liabilities never change (meaning there is no injection of third-party capital); (3) pricing is set within the same controlled group of entities (meaning transactions are not made at arm's length); and (4) the assuming reinsurer is not subject to the same reserving, testing, and disclosure requirements.

---

[29] *See* Fabio Cortes, Mohamed Diaby, Peter Windsor, IMF, *Global Financial Stability Note, Private Equity and Life Insurers*, at 9-10 (Dec. 2023), available at: https://www.imf.org/-/media/files/publications/gfs-notes/2023/english/gfsnea2023001.pdf.

[30] *Id.* at 12.

[31] Ex. A, *When Wall Street's Insurance Playbook Goes Wrong*, *supra* n.3.




Ex. A, *When Wall Street's Insurance Playbook Goes Wrong*, *supra* n.3.

55. Through captive reinsurance, insurance companies, or often their private equity owners, can artificially inflate capital surplus on the companies' balance sheets, creating the illusion of financial stability – and indeed, 'fake' capital surplus.[32] In reality, captive reinsurers conceal capital shortfalls by allowing insurers to take credit for reinsurance backed by an affiliated captive, rather than by independent capital available to pay policyholder claims. This practice twists capital surplus figures by treating affiliated-captive reinsurance as surplus-supporting credit, even though the underlying liabilities remain within the same corporate structure and may lack independent capital backing.

56. The groundwork for Defendants' misconduct was laid even before the Acquisition was completed, when complex reinsurance transactions and other financial maneuvers shifted liabilities and undisclosed reinsurance risk into PHL, which Defendants both enhanced and

---

[32] Capital surplus is a critical metric for providers of private insurance, as it serves as a direct measurement of the company's ability to pay its claims while remaining solvent. This surplus is calculated by the insurer collecting premiums and interest, which are used to directly pay operating costs, immediate claims, and expenses. Any remaining funds following this 'break-even' are labeled as surplus. Capital surplus also serves as a metric insurance rating agencies use to evaluate financial strength. Finally, surplus may also impact offered premium rates, as a provider with high capital surplus can induce new customers with irregular or decreased premiums on policies.

concealed by continuing to solicit premiums without disclosing their effect on PHL's claims-paying capacity and over-the-cap benefits, as discussed *infra*, ¶¶103-115. On June 30, 2015, Phoenix Life Insurance Company ("Phoenix Life") – a subsidiary of Phoenix – now known as NNY, entered into a modified coinsurance ("ModCo") reinsurance agreement with PHL, under which Phoenix Life retroceded, and PHL reinsured, 80% of Phoenix Life's assumed in-force block of Group Executive Ordinary ("GEO") corporate-owned whole-life insurance policies.[33] Through this transaction, PHL assumed approximately $1.26 billion in liabilities. In connection with the transaction, PHL agreed to pay Phoenix Life a ceding commission of approximately $162.1 million.

57. Under the ModCo arrangement, Phoenix Life retained the assets equal to the statutory reserves and the liabilities associated with the reinsured business, while PHL received the economic risks and rewards of that business through ModCo adjustments. The arrangement increased risk to PHL policyholders and annuitants because PHL took on the economic downside of a large block of insurance liabilities while Phoenix Life kept the related reserve assets, leaving PHL's surplus, claims-paying capacity, and ability to pay over-the-cap benefits more vulnerable if claims, reserves, or related-party adjustments moved against PHL. Accordingly, the ModCo assets were then used to pay Phoenix's ModCo-associated insurance claims as they came due.

58. But Phoenix's RBC-based system, which was intended to calculate the minimum capital that Phoenix needed to support risks, did not factor these asset risks into Phoenix's ACL-RBC ratio. As a result, Phoenix's ACL-RBC ratio artificially rose without any actual business or capital increases. Ultimately, this set the table for Golden Gate and Nassau to inject less capital into PHL than what would have been actually needed to stabilize the Company.

59. Following the Acquisition, Defendants continued to conceal from Plaintiffs and Class Members the increased risk to their policies from PHL's deteriorating financial condition, knowingly effectuated through a complex series of financial maneuvers, including, *inter alia*, the:

---

[33] ModCo is a type of life insurance reinsurance where the original insurer (the ceding company, here, Phoenix) retains the assets and policy reserves on its own balance sheet, while transferring underlying insurance liability risk to a reinsurer.

(1) creation of, and/or participation in, captive reinsurance transactions, XOL (defined below) agreements, and STOLI-related (defined below) transactions; (2) cancellation of Golden Gate and Nassau's capital backstop commitments under the CMP; (3) thrusting of PHL into run-off mode and routing of capital to other Nassau controlled entities; (4) discreet restructuring of PHL and Nassau entities to mask known risk; and (5) "deconsolidation" of PHL from Nassau to insulate Defendants from further capital infusions that would have staved off PHL's torpedoing financial trajectory.

**1. The Captive Reinsurance and XOL Scheme**

60. Captive reinsurance creates two key risks for policyholders. First, by transferring risky policies to a captive off the company balance sheet, the insurer can appear more financially stable to the public than it actually is. This distorts the true risk of nonpayment, influencing policyholders to continue funding policies on the mistaken premise that the insurer has sufficient capital to honor future claims. Second, captive reinsurance insulates policies from protection by neutral third parties (as both the insurer and reinsurer are the same overarching entity). This is precisely the risk that materialized here: Defendants' captive insurance scheme removed the backstop needed to protect Plaintiffs' and Class Members' policies against PHL's default or other policy-related risk. Defendants established two key captive reinsurers of PHL between 2019 and 2021.

**a. Concord Re**

61. *First*, Defendants, through PHL, created Concord Re, Inc. ("Concord Re") in 2019 as a wholly owned Connecticut-based subsidiary and captive insurance company. On October 1, 2019, PHL entered into a combined coinsurance funds withheld agreement and ModCo agreement with Concord Re, reinsuring ***all*** of PHL's net retained business (referred to as the "Concord Treaty" by PHL).[34] According to PHL's 2023 Annual Statement (filed just weeks before the

[34] PHL Variable Insurance Company, In Rehabilitation, Statutory Financial Statements and Supplemental Schedules (Dec. 31, 2025, 2024 and 2023), at 7, available at: https://www.sec.gov/Archives/edgar/data/1072247/000110465926050104/tm2610824d1_nvpfs.htm.

petition of Rehabilitation was filed), PHL reported more than ***$1.3 billion*** in reinsurance ceded to Concord Re under their 2019 agreement, and the total amount of reinsurance ceded to affiliates at year-end 2023 amounted to ***$4.3 billion***.[35] According to Thomas Gober, the Certified Fraud Examiner, this amount of affiliated party reinsurance was "wildly excessive,"[36] particularly given that PHL reported a capital surplus of approximately ***negative*** $135 million at the end of 2023.

62. Nassau used the same playbook elsewhere in its insurance structure, including through Nassau Life and Annuity Company ("NLA"), which ceded billions of dollars in liabilities to wholly owned captive reinsurers Lynbrook Re, Inc. ("Lynbrook Re") and Sunrise Re, Inc. ("Sunrise Re"). Like Concord Re and Palisado Re, those captives are private and separately domiciled from Nassau and Golden Gate, and have not filed publicly available audited financial statements, further obscuring the true location and quality of the capital supposedly supporting Nassau-controlled liabilities. For example, between 2019 and 2020, NLA ceded approximately $565.5 million and $75.6 million, respectively, to Lynbrook Re, despite reporting surplus of only approximately $175.82 million, and later ceded approximately $5.7 billion in reserve credit for its transactions with Lynbrook Re and Sunrise Re.

63. In other words, Defendants, via PHL, were relying on (and proceeded to rely on until the Rehabilitation) billions of dollars in credit from its ***own*** affiliates without maintaining actual surplus cushion, thus misrepresenting to Plaintiffs, Class Members, and regulators PHL's actual ability to break-even and remain solvent.

64. At the same time as the Concord Treaty, Concord Re entered into a 30-year excess-of-loss ("XOL") agreement with another Nassau affiliate based in the Cayman Islands, Nassau Re

---

[35] For this transaction to take place, the CID approved each transfer to Concord Re. The CID granted Concord Re a permitted-practice exemption from cash-flow testing under Connecticut General Statutes §38A-9100 ("Conn. Gen. Stat."), and allowed Concord Re to book an XOL reinsurance agreement from Nassau Re Cayman (defined below) as an asset. In turn, reserve credit flowed back to PHL, "improving" its capitalization on paper.

[36] Declaration of Edward S. Stone, Ex. 6, Declaration of Thomas D. Gober, at 4 ("Gober Dec."), Dkt. #267.00, available at: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=32574595. Unless otherwise stated, all citations to "Dkt. #" herein refer to filings in the Rehabilitation proceeding.

(Cayman) Ltd. ("Nassau Re Cayman"), that provided coverage of up to $200 million in the event PHL assets were not sufficient to pay policyholder claims.[37] In this instance, the XOL agreement provided Concord Re with additional protection if claims on PHL's reinsured policies exceeded the agreed-to threshold. As a secondary benefit, Concord Re's balance sheet increased, as the reinsurance itself technically served as a new asset for Concord Re. Concord Re booked this XOL receivable as an "admitted asset," artificially inflating its balance sheet to support PHL's reserve credit (reserves set aside for expected debts or defaults) and indicating that such funds ***were immediately available to pay policyholder claims***.[38]

65. That treatment violated Connecticut's affiliate-transaction safeguards, including Conn. Gen. Stat. §38a-136, which requires transactions in insurance holding company systems to be fair and reasonable, supported by reasonable charges and proper accounting allocations, and accurately reflected in books and records showing the transaction's true nature and details, and surplus to be reasonable in relation to PHL's liabilities and financial needs. Defendants' Concord Re, Nassau Re Cayman, and Palisado Re structure, however, converted contingent affiliate promises and prepaid-service arrangements into illusory reserve credit, while obscuring PHL's true surplus, claims-paying capacity, and exposure to over-the-cap policyholder obligations.

66. The admissible asset associated with the XOL agreement was entirely contingent and should not have been treated as an admitted asset. The NAIC and many states do not permit

[37] XOL agreements are reinsurance contracts that activate when costs or losses of business operations exceed a predetermined threshold. These agreements often limit primary insurance payouts from highly expensive instances, such as catastrophic events, with the reinsurer covering the difference of 'excess' claims. These agreements may also inflate the asset side of the insurer's balance sheet and conceal financial distress, as portions of liabilities are housed with the reinsurer.

[38] The CID was required to authorize the credit taken for reinsurance with Concord Re. Transactions with affiliates must be fair and reasonable and reported using like metrics according to the Insurance Company Holding Act, Conn. Gen. Stat. §§38a-129 to 38a-140. Here, the parties provided no explanation for why a pre-paid services agreement with Nassau was approved as another Concord Re admitted asset, which are supposed to be liquid, measurable and represent a "present right" to a future economic benefit. There is no such thing as a present right to unknown and unlimited future losses.

an insurer to take full credit for reinsurance ceded to a wholly-owned captive.[39] For example, California, through California Insurance Code §922.4(a),(b)(1) ("Cal. Ins. Code"), expressly excludes most captive reinsurance as "authorized" or "licensed" insurers, thus prohibiting a primary insurer from classifying captive reinsurance recoverable as admitted assets at all. Defendants' treatment of Concord Re and the Concord Treaty shirked these common insurance practices by avoiding domicile status in states like California where these rules exist.[40] Thus, while the reserve relief that allowed the reporting of positive surplus was available in Connecticut – where Concord Re, and later, Palisado Re, Inc. ("Palisado Re") (discussed below) were based – it would not have been available in California, New York, or other jurisdictions with similar restrictions.

67. Industry authorities, including global investment manager Conning & Co., have gone as far as describing these sorts of XOL agreements as posing "***underappreciated risks… that these assets could dissipate suddenly and leave insurers exposed***."[41] Indeed, the Commissioner himself later found that the XOL designation here materially and artificially inflated PHL's financial statements.

68. Concord Re's practice of booking the XOL receivable as an admitted asset on company balance sheets caused immediate financial stress for PHL. In PHL's SEC filings for

---

[39] "According to the NAIC Actuarial Guideline LV, effective for year-end 2025, XOL reinsurance cannot be included as an admitted asset on a life and annuity company financial statement. Even before the NAIC amended its Actuarial Guideline, XOL agreements that were conditional in nature, like the [Concord Re XOL agreement] . . . violated certain fundamental principles of statutory accounting, specifically the National Association of Insurance Commissioners Statement of Statutory Accounting Principle No. 4 which clearly defines an asset and describes scenarios in which certain 'assets' must be non-admitted (which means they don't count as assets on company financial statements). Importantly, the XOL 'asset' [] fails in the following ways: the XOL agreement is contingent upon a future event occurring which violates the fundamental definition of an asset because 'the event giving rise to the entity's right to or control of the benefit has already occurred.'" Gober Dec. at 7-8, *supra* n.36.

[40] Further, New York, N.Y. Ins. Law §1301(a)(9) expressly prohibits classifying a reinsurance recoverable "from a captive insurance company" as an admitted asset.

[41] *She paid an insurance company $99,000 to generate retirement income for life. Then it collapsed.*, *supra* n.4.

fiscal year ("FY") 2019 (filed just two months after Concord Re's inception and the transactions described above), PHL recorded an impairment of $48.6 million for its investment in Concord Re, due to Concord Re's operating losses of $33.8 million and a write off of a remaining investment balance of $14.8 million. According to PHL, "[d]ue to the uncertainty as to the timing and amount of Concord's future earnings and the long duration of the reinsurance agreement, the carrying value of Concord was written down to zero as an other-than-temporary impairment [for PHL]."[42]

**b. Palisado Re**

69. *Second*, Defendants, through PHL, created Palisado Re in November 2021, as a Connecticut-based wholly owned subsidiary and captive insurance company. On November 15, 2021, the Concord Re XOL agreement was novated (*i.e.*, transferred) from Nassau Re Cayman to Palisado Re, a subsidiary of PHL, and XOL coverage was increased from $200 million (as previously agreed) to $450 million.[43] This allowed Concord Re to continue treating the XOL receivable as an admitted asset to support PHL's reserve credit, even though "Palisado Re never had sufficient assets to cover the liabilities it assumed[.]"[44] Mr. Gober, the Certified Fraud Examiner, described the transaction as "highly suspect," "lack[ing] substance," "not at arm's length," and "d[oing] nothing more than hid[ing] PHL's actual financial condition, which was ***complete and total insolvency*** as of November 15, 2021, the date of the Nassau Cayman Re-to-Palisado Re sham novation transaction."[45] Indeed, ***the CID accepted the deal on the premise that PHL was solvent***, and AM Best upgraded Nassau's Financial Strength Rating to B++ shortly after the novation.[46] Ultimately, the Palisado Re transactions in 2021 caused PHL's RBC ratio to

---

[42] *PHL Variable Insurance Company, Statutory Financial Statements and Supplemental Schedules, December 31, 2019 and 2018* (KPMG LLP, Apr. 24, 2020), n.4, at 23.

[43] The CID, as before, approved this deal based on the premise that all entities involved were solvent (they were not). The CID's permitted practices continued to shield Concord Re's, and subsequently, Palisado Re's, captive losses.

[44] Gober Dec. at 6, *supra* n.36.

[45] *Id.*

[46] *AM Best Upgrades Credit Ratings Of Nassau Financial Group, L.P.'s Insurance Subsidiaries*, BUSINESSWIRE (Dec. 17, 2021), available at: https://www.businesswire.com/news/home/

***artificially*** increase from 240% (for FY 2020) to 346% (for FY 2021), creating the illusion of increased financial stability.

70. Defendants' captive reinsurance scheme was designed to mask risk from Plaintiffs and Class Members, and served as the tool that was largely responsible for PHL's demise. Indeed, as Mr. Gober concluded: "***Nassau [] systematically enter[ed] into reinsurance agreements with wholly owned Captives to hide risk***," and "PHL's excessive dependence upon reinsurance and modified co-insurance (ModCo) with its own affiliated Captive reinsurers is one of the ***main reasons*** that PHL in Rehabilitation is reporting more than ***$2.2 billion*** in *negative* surplus[.]"[47] (italicized emphasis in original).

**2. The STOLI Buyback Scheme**

71. In 2017, Golden Gate and Dominik set up additional affiliates to purchase PHL policy rights in secondary and tertiary markets. This allowed Nassau to collect full policy benefits directly from PHL.[48] On July 18, 2017, Nassau incorporated DSM Sands, LLC ("DSM Sands") (formerly known as Jog Works LLC) in Delaware to begin purchasing PHL policy rights. Likewise, on July 26, 2017, and December 21, 2017, Nassau incorporated Lifebrook Investments Designated Accounts Company ("Lifebrook") in Ireland and Magni Re, Ltd. ("Magni Re") in the Cayman Islands to do the same. PHL then lent approximately $150 million to DSM Sands, which in turn lent the same approximately $150 million to Lifebrook, which used the loan funds to repurchase PHL policies from policyholders or other investors. This occurred in tandem with PHL executing XOL reinsurance agreements with Magni Re, which reinsured these now-repurchased policies. By routing these repurchases through the entities in Ireland and the Cayman Islands

---

20211217005602/en/AM-Best-Upgrades-Credit-Ratings-of-Nassau-Financial-Group-L.P.s-Insurance-Subsidiaries.

[47] Gober Dec. at 8, 10, *supra* n.36.

[48] Commonly, policyholders will sell their existing life insurance policies to third-party investors for a cash payout that is higher than the policy's current surrender value but less than the total death benefit. The new investor (here, the Nassau Affiliate) then pays the premiums and collects the death benefit when the original beneficiary passes away.

between 2017 and 2020, Defendants kept the transactions outside the ready view of U.S. regulators and PHL policyholders.

72. Subsequently, through Westgate Delaware, LLC ("Westgate"), a Nassau affiliate created in 2019 as the successor in interest to Lifebrook, Defendants continued to purchase rights to standard UL policies and rights subject to stranger-oriented life insurance ("STOLI") agreements procured against PHL policies (the "Buyback Program"). STOLI is the term for an arrangement where investors initiate a life insurance policy or a life insurance-dependent agreement on a stranger to profit from their eventual death. Third-party investors commonly target senior citizens, offering upfront cash payments or free coverage (among other incentives) in exchange for policy rights. The investors pay premiums and, after a holding period, the policy ownership transfers to the investors. Because the policy owners have no personal or continued financial relationship with the insured, the agreements function as a speculative wager on the insured's life expectancy. STOLI is widely illegal because insurance laws require the policy owner to have a legitimate financial or familial stake in the insured's continued life (an 'insurable interest'). Indeed, many states, including but not limited to California, Illinois, and Delaware, have enacted state-specific statues completely prohibiting any life insurance arrangement that involves purchasing insurance against life in exchange for a partial payment of a policy's face value to beneficiaries upon death.[49]

73. Westgate specifically targeted policies subject to class action litigation settled by Phoenix in 2015 (pre-Acquisition), where, as part of the settlement, Phoenix agreed not to challenge a large portion of in-force policies/agreements it had previously issued and charged increased COI rates on the basis that these policies were STOLI, illegal, and thus lacked insurable interest.[50] The purpose of the Buyback Program was to provide an avenue for Nassau and Golden

[49] *See, e.g.*, Cal. Ins. Code §10113 *et seq.*, https://www.insurance.ca.gov/0150-seniors/0100alerts/STOLI-OR-SPINLIFE.cfm/1000.

[50] These cases include *Fleisher et al v. Phoenix Life Insurance Company*, No. 1:11-cv-08405 (S.D.N.Y. 2011) and *SPRR LLC v. Phl Variable Insurance Co.*, No. 1:14-cv-08714 (S.D.N.Y. 2014).

Gate to reacquire and fund STOLI policies through its affiliates and ultimately collect illegal STOLI proceeds themselves, as opposed to allowing a policyholder, designee, or other third party investors to receive that benefit. As Westgate obtained these policies, it funded and serviced them either by capital injections directly from Golden Gate or Nassau, loans from other Nassau affiliates, or from leftover policy proceeds from prior STOLI maturities.

74. By April 2020, Defendants (through Nassau affiliate Westgate) had purchased 136 Buyback Program (STOLI) policies for $171.5 million, with total policy values of $943 million. As alleged in *Estate of Jane Oristano v. Vida Capital Inc., et al.*, Case No. N23C-04-258 EMD CCLD (Del. Sup. Ct.), Westgate's only assets at this time were the Buyback Program policies. Westgate conducted no clear analysis on any of the Buyback Program policies to ensure that the acquisition of each policy was a good or legal investment. Additionally, according to Westgate's designee, it was irrelevant to Westgate whether the policies in the Buyback Program had insurable interest or were valid. Defendants directed the acquisition of these policies, so Westgate simply had no choice but to acquire them. Westgate was not formed to be profitable, but instead, to insulate any losses possible for the riskiest policies controlled by Defendants. A majority of these policies were issued between 2004 and 2007 (and, as a result, had high amounts of premiums paid towards them), had high face (benefits) values, were issued against the lives of senior citizens, and had been previously owned by non-Golden Gate or Nassau third party investors; classic characteristics indicative of illegal STOLI.

75. Defendants (via PHL) failed to disclose the existence of these circular (and illegal) buy-back practices in any of the related companies' statutory and/or audited financial statements. These companies also failed to fully disclose the nature of the loan transactions that took place between PHL, DSM Sands, and Lifebrook/Westgate. Indeed, one of the Commissioner's first moves in the Rehabilitation was to treat the DSM Sands loan as "fully impaired" with little explanation about why DSM Sands was no longer expected to have sufficient liquidity to repay the loans or where PHL's money went.

76. Defendants' highly suspicious STOLI scheme induced policyholders (often unknowingly) to transfer the rights and/or benefits of their Phoenix Products back to entities

controlled by Defendants. Policyholders who took part in these transactions were uninformed of the STOLI scheme and did not know that the entities, which they had transferred their Phoenix Product policy rights/benefits to, were indeed controlled by Defendants. The STOLI scheme also resulted in litigation in Delaware in the aforementioned *Oristano* case, which includes detailed allegations about this scheme.

### 3. Golden Gate and Nassau Terminate PHL's Capital Backstop and Thrust the Company into Run-off

77. According to one expert, whereas RBC requirements are designed to catch financial problems before "the tank empties," a capital management agreement (or plan) is intended to ensure that a parent company will preemptively "refill the tank if RBC trends the wrong way[.]"[51] But in a November 13, 2019 letter from Nassau, signed by Phillip Gass, to the CID, Nassau confirmed that its commitments under the CMP at the time of the Acquisition – including maintaining an ACL-RBC ratio of at least 400% – per agreement with the CID, were "null and void," replaced by a one-time $50 million capital contribution and an assurance that PHL's ACL-RBC ratio would meet a new 200% threshold.[52] Gass also represented that PHL would only pay dividends if this new benchmark was met. With the termination of the CMP, there was ***no continuing obligation*** on behalf of Golden Gate and Nassau to provide adequate support to PHL, as they had assured regulators at the time of the Acquisition.

78. Also at the end of calendar year 2019, PHL ceased underwriting and issuing new policies, with all other new PHL business re-routed or otherwise transitioned to various entities owned and operated by Golden Gate and Nassau. Cumulatively, this resulted in PHL's assets shifting into Nassau, but its liabilities left within the PHL shell.

---

[51] Warren S. Hersch, *How PHL Lost Its Capital Backstop Before Its Collapse*, LIFE ANNUITY SPECIALIST (June 1, 2026), available at: https://www.lifeannuityspecialist.com/login?from=https%3A%2F%2Fwww.lifeannuityspecialist.com%2Fpc%2F5173554%2F733684%3Fall%3Dtrue%26referrer_module%3Darticle.

[52] *Id.*

79. In 2019, Standard & Poor downgraded PHL to "junk" status – from BB to CCC+ – citing a $100 million decline in capital adequacy, with the Company entering run-off following the cessation of the marketing and sale of new business.[53] This run-off also served as the foundation for the aggressive strategy to re-engineer the Company's troubled balance sheet through the captive reinsurance maneuvers discussed above. Subsequently, ratings agencies ceased rating PHL entirely.[54] PHL's capital and surplus remained stagnant at approximately $40 million for the next four years, hidden within certain of the Nassau Affiliates, invisible to investors and the public.[55]

**4. Golden Gate and Nassau "Deconsolidate" PHL from Nassau and Drive the Company Over the Brink**

80. In its statutory annual statements for the year ending 2021, at the same time that the Concord Re XOL agreement was transferred to Palisado Re (on November 15, 2021), Golden Gate and Nassau announced that they had moved PHL off the Nassau balance sheet while contributing an additional $30 million of capital. This "deconsolidation" was effectuated by Nassau transferring 100% of PHL's capital stock to PHL Holdings, LLC, a newly created shell entity with no apparent business activity (other than assuming PHL capital stock). Through this transaction, Golden Gate and Nassau were released from all remaining obligations to PHL (undermining the CMP and post-CMP reassurances), with Nassau continuing to service all PHL business and invest all PHL related assets (for substantial fees).[56]

---

[53] Junk investment ratings, commonly referred to as high-yield or speculative-grade, are assigned to debt securities rated below investment grade by major credit rating agencies. These ratings indicate a higher risk of issuer default and typically offer higher interest rates to compensate investors for the added risk.

[54] *The Nassau Cos. of New York And PHL Variable Insurance Co. Ratings Withdrawn At Company Request*, S&P GLOBAL RATINGS (Sep. 11, 2019), available at: https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/11148469.

[55] *See generally* Rehabilitator's First Accounting and Status Report (Dkt. #122.00) at Ex. A, available at: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=28806937.

[56] Gober Dec. at 6-7, *supra* n.36.

81. Defendants primarily utilized Nassau Asset Management LLC ("NAMCO") to extract these further fees through servicing and investment arrangements. Between 2017 and 2024, NAMCO collected $82.4 million solely in management fees from PHL. Through NAMCO, Defendants also exercised investment-management authority over PHL's investable assets, and directed or participated in investments of PHL assets in Nassau-affiliated vehicles that generated additional fees or economic benefits for Nassau affiliates. Despite their separation, Nassau and PHL also maintained many of the same executives and continued to use the same actuaries and accountants, and PHL continued to report positive capital surplus through Nassau's artificially engineered RBC ratios.

82. In context, this "deconsolidation" of PHL from Nassau indicates that PHL was destined to collapse by the time that Defendants were aware of PHL's "total insolvency"[57] – in November 2021 – and sought to actively avoid having to comply with Nassau's obligations to keep PHL solvent. Indeed, as Mr. Gober's research has revealed, Golden Gate and Nassau's elimination of PHL's capital backstop – which was intended to provide a safety net for Plaintiffs and Class Members – coupled with the "deconsolidation" of PHL, confirms that "***Nassau knew that PHL was doomed to fail as early as November of 2021 and it was trying to avoid having to comply with its obligations to keep PHL Variable solvent***."[58]

83. Defendants' operating structure for Nassau and PHL at this time is conveyed in the diagram below.

---

[57] Gober Dec. at 6, *supra* n.36.

[58] *Id.* at 6-7.




84. Also in 2021, while PHL remained within and was operationally managed by Nassau, Nassau executives – with Golden Gate and Dominik's backing – caused PHL to funnel $150 million to Concord Re in 2021, which Concord Re used to prepay expenses and booked "prepaid expenses" as an "admitted asset" on its balance sheet. Specifically, Nassau caused PHL to transfer a block of corporate-owned whole life insurance policies, dubbed the Group Executive Ordinary or "GEO Block," to Nassau affiliate NLA for a $150 million ceding commission. PHL then transferred the commission to Concord Re, and Concord Re prepaid $150 million of future administrative expenses to NCNY.

85. Between 2021 and 2023, NCNY received over $30 million in total from PHL under the guise of prepaid administrative services.[59] Through these actions, Nassau replaced capital liabilities available to support PHL policyholders with a prepaid-expense asset that the Commissioner later disallowed.

86. The $150 million transfer was not an isolated transaction, but part of PHL's broader—and increasingly precarious—dependence on Concord Re. By year-end 2022, PHL's

[59] Even before this maneuvering, between 2018 and 2019, NCNY received $120 million in dividends subject to Defendants' scheme.

reinsurance programs totaled nearly ***$5.3 billion***, of which approximately ***$3.5 billion*** arose from dealings with Concord Re. When the value of the collateral supporting those arrangements declined, PHL recognized a ***$176 million*** reserve-credit impairment charge for fiscal year 2023. The statutory loss for the year reached $162 million, and surplus fell from $45 million for FY 2022 to ***negative $135 million*** for FY 2023.

87. Meanwhile, on January 9, 2023, Golden Gate announced that Angel Island Capital Management LLC ("AIC") – Golden Gate's wholly owned investment credit company – had merged into NAMCO, increasing Nassau's capital by $300 million and total assets by $3.6 billion. As a result, AIC had shifted from an asset of Golden Gate into a subsidiary of Nassau.

88. Later in 2023, Golden Gate announced that Nassau would receive a $130 million equity investment from non-Golden Gate entity Fortress Investment Group ("Fortress"). Subsequently, Fortress would take ownership of 7.7 percent of Nassau, and Golden Gate would remain Nassau's majority controlling shareholder. These transactions were organized and precisely timed by Dominik and Golden Gate to inject capital into Nassau, immunized from PHL. These massive investments occurred shortly after PHL was deconsolidated from Nassau and the CMP was terminated.

89. The CID's inability to identify Defendants' misconduct sooner is a testament to Defendants' ability to engage in financial wizardry and concealment to the detriment of Plaintiffs and Class Members. Indeed, plaintiff Williams told *Bloomber*g: "I'm ***beyond perplexed*** as to how this company's kind of woeful financial position wasn't caught far sooner by state regulators . . . ***It blows my mind***."[60] As *Life Annuity Specialist* described it, the "broader sequence of events" driven by Defendants and resulting in PHL's demise is "not how ongoing parental support is supposed to work" (quoting Larry Rybka, CEO of broker-dealer Valmark Financial):

> "PHL Variable is ***unusual*** because the tank was not just empty — there was a roughly ***$2.2 billion hole*** behind it, and the CMA framework that was supposed to prevent exactly that outcome was allowed to be reset," Rybka said.

---

[60] Ex. A., *When Wall Street's Insurance Playbook Goes Wrong*, *supra* n.3.

> While a capital maintenance agreement might reasonably be modified if an insurer faces only temporary and limited impairment, Rybka said he does not believe that was the case at PHL.
>
> He also characterized the broader sequence of events — the reset of the original framework, the creation of affiliated reinsurance structures and PHL's later separation from Nassau — as ***unusual*** relative to normal supervisory expectations around ongoing parental support.
>
> "***Resetting a CMA in connection with a restructuring, spinning the insurer out from under the original parent and continuing to rely on affiliated reinsurance arrangements is not how ongoing parental support is supposed to work***," he said.[61]

90. Defendants' financial alchemy, perpetuated through, *inter alia*, a web of affiliated and capitive reinsurance arrangements after the Acquisition, the termination of PHL's capital backstop, and PHL's ultimate deconsolidation from Nassau – all designed to hide the true risk to Plaintiffs and Class Members (and from the CID) – is partially illustrated below.




---

[61] Warren S. Hersch, *How PHL Lost Its Capital Backstop Before Its Collapse*, *supra* n.51.

**D. KPMG's Certifications Further Obfuscate PHL's Rapidly Deteriorating Condition**

91. Beginning with the Acquisition, KPMG LLP ("KPMG") was retained to serve as the independent auditor for PHL, and later, certain Nassau Affiliates, including Nassau Re Cayman. As auditor, KPMG filed independent auditor reports, which were appended to PHL's annual financial reports.[62] These reports provided general audit opinions on the Company's financial data, compliance with accounting and reporting regulations, and, most importantly, judgments on PHL's ability to continue as a going concern.

92. Between 2015 and 2020, KPMG's independent audit reports for PHL were silent as to PHL's artificially and materially inflated financial statements. It was not until 2022, shortly following PHL's deconsolidation from Nassau, when KPMG prepared and delivered to PHL's Board of Directors its Independent Auditors' Report for year-end 2021, that KPMG first flagged the shuffling around of reinsurance liabilities, as follows:

> Effective October 1, 2019, PHL entered into a combined coinsurance funds withheld and modified coinsurance agreement (the "Concord Treaty") that reinsures the total retained risk in PHL to a wholly-owned captive subsidiary, Concord Re. Inc. ("Concord"), that is licensed in Connecticut. Concord entered into a 30-year excess-of-loss agreement (the "XOL Agreement") with an affiliate, Nassau Re (Cayman) Ltd. ("NKY"), that provided coverage of up to $200 million in the event assets are not sufficient to pay claims. Effective November 15, 2021, this XOL agreement was novated to Palisado Re, Inc. ("Palisado"), a subsidiary of PHL, and subsequently its coverage was increased to $450 million. The receivable, if any, resulting from the XOL Agreement has been approved by the Connecticut Insurance Department (the "Department") as an admissible asset on Concord's financial statements. The business reinsured to Concord experienced increased net losses due to COVID-19 and the economic environment and could continue to in the future.[63]

93. Prior to this disclosure, KPMG had not raised red flags or warnings about the highly questionable and circular transactions that were designed to mask PHL's financial deterioration.

94. Even in the annual reporting following this disclosure, KPMG failed to identity PHL's increasing struggle to continue as a going concern until after administrative supervision and

---

[62] *See, e.g.*, Rehabilitator's Second Accounting and Status Report (Dkt. #147.00) at 20-25, available at: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=30062732.

[63] Gober Dec. at 6, *supra* n.36.

Rehabilitation proceedings had already begun. KPMG also failed to identify and effectively analyze the impact of the host of circular transactions involving PHL, its captives, Nassau, and its thinly-capitalized, wholly-owned captive reinsurers.

**E. The Rehabilitation**

95. On May 17, 2024, the Commissioner, then Andrew N. Mais, filed a petition seeking an order of rehabilitation as to PHL, Concord Re, and Palisado Re, pursuant to the provisions of the Insurers Rehabilitation and Liquidation Act, Conn. Gen. Stat. §§38a-903 to 38a-961. Three days later, the court granted the petition and entered an Order of Rehabilitation and Appointment of State Insurance Commissioner as Rehabilitator, appointing the Commissioner as rehabilitator (the "Rehabilitator"). On May 20, 2024, the Court also issued a Temporary Moratorium Order in the Rehabilitation, preventing or limiting policy withdrawals, surrenders and death benefit payouts.

96. On June 25, 2024, the Court entered a permanent Moratorium Order, limiting death benefit payments and policy withdrawals for all Class Members. Specifically, the Moratorium Order provided an aggregate limit on death claims of no more than $300,000, "regardless of the . . . size" of the life insurance policy:

> *Aggregate Limit - Life Insurance Policies Covering One Individual*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $300,000 in the aggregate under one or more life insurance policies covering one individual regardless of who owns the policies or the number of beneficiaries.[64]

97. The Moratorium Order also provided an aggregate limit of $250,000 for annuities:

> *Aggregate Limit - Annuities Covering One Annuitant*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $250,000 in the aggregate under one or more annuities covering one annuitant regardless of who owns the annuities or the number of beneficiaries.[65]

---

[64] Moratorium Order (Dkt. #101.86) at 3, available at: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=27769874.

[65] *Id.* at 5.

98. Despite these Payment Limits – which in many cases would result in Class Members losing hundreds of thousands if not millions of dollars in benefits for which they had contracted – the Moratorium Order left policy and annuity holders to choose whether to surrender, or to continue making periodic premium payments to maintain in-force Phoenix Products as provided by the terms of those products.[66]

99. On November 20, 2024, the Rehabilitator revealed that PHL's business maintained a capital and surplus of ***negative $2.1 billion***. In particular, the CID performed cash-flow testing on Concord Re and Palisado Re ***for the first time***, surfacing the additional approximately ***$1.3 billion*** previously-hidden deficit. Combined, unfunded life insurance policy benefits through 2030 also reached nearly ***$4 billion***. As a result, the CID ***disqualified*** both the XOL-as-asset treatment and the $150 million Nassau prepayment. Further, the CID classified the $149 million DSM Sands loan as ***fully impaired***, nearly wiping out all capital gains from FY 2024. By this time, approximately 800 policy claims totaling ***$60.8 million*** as paid (versus $230 million without the cap), and roughly $250 million of cash, had accumulated at PHL. While unitized separate-account funds remained insulated and saleable, the "toxic" over-the-cap UL policy block then sat (and continues to sit) primarily at Concord Re, with about ***$4.3 billion*** of UL and other death benefit policies retained there and not retroceded to outside reinsurers.[67]

100. On May 20, 2025, the Rehabilitator reported that PHL's capital and surplus decreased to ***negative $2.2 billion*** (which has since decreased even further, to negative $2.3 billion

---

[66] The Commissioner represented that the Moratorium Order limits generally provide benefits that policyholders and annuitants would receive from SGAs if PHL were placed in liquidation. In every state, a life and health insurance guaranty association (*i.e.*, an SGA) exists to protect policyholders should an issuing insurance company become insolvent. Coverage provided by guaranty associations differs from state to state. Most state associations offer at least $300,000.00 in 'capped' coverage for death benefit claims under life insurance policies and $100,000 in cash surrender value coverage, as specified by the NAIC Life and Health Insurance Guaranty Association Model Law, though SGA limits on life insurance benefits range from $250,000 to $500,000 depending on the policyholder's state of residence. Annuity contracts are also covered by SGAs in amounts ranging from $250,000 to $500,000.

[67] "Unitized separate-account" products refer to PHL's variable life and annuity products, whose values are held in segregated, unit-valued investment subaccounts that are applied first to those policies' obligations, rather than in PHL's general account.

according to the Rehabilitator's most recent update). In November 2025, Mais unexpectedly resigned as Commissioner of the CID (and as Rehabilitator), succeeded by Josh Hershman. Then, on December 31, 2025, via a liquidation notice, the Rehabilitator determined that Rehabilitation of PHL was not feasible as ***all lines*** of business were "impaired[.]"[68] In other words, the new Rehabilitator determined that a rehabilitation of PHL would not be possible at all, effectively transitioning the Rehabilitation into a liquidation proceeding. Under Connecticut law, policies ***terminate*** 30 days after a liquidation order except as covered by a guaranty association.[69] Undoubtedly, a finding of PHL's insolvency and the issuance of a liquidation order would be detrimental, if not disastrous, to policy and annuity holders who are "over-the-cap" of applicable Payment Limits – *i.e.*, Plaintiffs and Class Members.

101. Following a modification to the Moratorium Order, the Rehabilitator represented that policyholders could elect to surrender their policies in exchange for a fixed claim in the amount of the surrender value plus premium paid as of June 2024, and the "cash surrender value component of the adjusted surrender value claim will be paid by the applicable [SGA] up to its statutory limit, typically $100,000," with "[a]ny cash surrender value above this amount and all of the returnable costs of insurance component . . . [to] be paid in the range" of "34 to 57%."[70] Even so, there is no guarantee that those PHL policyholders will receive benefits above the applicable

---

[68] Dkt. #232.00 at 2, available at: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=31665575.

[69] While the National Organization of Life & Health Insurance Guaranty Associations ("NOLHIGA") take first-dollar risk on the insurance policies involved in a moratorium or liquidation, providing an indirect "industry bailout," the Rehabilitator negotiates with NOLHIGA over leftover assets for a possible third-party transaction, and explores claims against prior owners for breach of fiduciary duty, breach of contract, and avoidable transfers.

[70] PHL Policy and Annuity Holder Information Session – Meeting Recording (Apr. 13, 2026), at 10-13, available at: https://portal.ct.gov/cid/-/media/cid/1_phl/phl-policy-and-annuity-holder-information-session.pdf?rev=cb090ed8f3a6402eb93a8e4eaba0388d&hash=62ED2066AD468996229B614F7F8EF79A. The "cash surrender value" represents the amount of money a permanent life insurance policyholder will receive if they choose to terminate the policy before its maturity date, or before the insured dies.

Payment Limits. In any event, the window within which Class Members could elect such relief has already closed.[71]

102. As discussed further below, each of Plaintiffs' policies is subject to the Moratorium Order and otherwise contain benefits in excess of the Payment Limits.

**F. Defendants Misled Plaintiffs and Class Members Regarding PHL's Financial Instability and the Imminent Threats to Their Policies**

103. Defendants have collected, continue to collect, or caused the collection of premiums, charges, and other amounts from Plaintiffs and Class Members, including through policy statements, premium or amount due notices or reminders, annual statements, and other routine communications sent by Nassau, PHL, and/or the Nassau Affiliates via the United States mail and other channels. These communications conveyed business as usual and presented the Phoenix Products as ongoing obligations backed by a functioning insurer, and sought payments to maintain Phoenix Products without disclosing PHL's materially deteriorated financial condition, impaired claims-paying ability, or the increased risk that benefits above the Payment Limits would not be paid or honored. These mailings and other communications misleadingly induced Plaintiffs and Class Members to continue paying for and maintaining Phoenix Products, and were important because they directly affected whether Plaintiffs and Class Members would: (1) continue paying premiums, policy charges, and other amounts to maintain their Phoenix Products; (2) surrender, exchange, withdraw, replace, or otherwise attempt to preserve the value of those products; and (3) understand the increased risk that PHL could not honor benefits above the Payment Limits.

104. Leading up to and following the Rehabilitation, these ongoing communications to PHL policy and annuity holders failed to disclose PHL's financial distress, the material risk associated with Plaintiffs' and Class Members' Phoenix Products, or Defendants' central roles in creating the circumstances giving rise to PHL's downfall. Had Defendants disclosed the truth

---

[71] On June 30, 2026, the Rehabilitator revealed that "[t]he timing of transitioning to liquidation is expected to occur in 2027" instead of 2026 as originally represented. Dkt. #271.00, available at: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=33005213.

about PHL's financial condition and the associated risks to Plaintiffs' and Class Members' policies before the Commissioner filed the Rehabilitation petition in May 2024, they could have sought to preserve value by performing a 1035 exchange – the tax-deferred transfer of funds from an existing life insurance policy or annuity to a new, similar policy, allowed under Section 1035 of the Internal Revenue Code.[72] This would have allowed Plaintiffs and Class Members to transfer funds from their Phoenix Products to new policies or contracts, with a new provider, without immediate tax liability. Additionally, Plaintiffs and Class Members could have surrendered or withdrawn against their policies and purchased other life insurance and annuity products.[73]

105. Instead, the Moratorium Order froze or limited Plaintiffs' and Class Members' ability to seek the full benefits – death benefits, surrender values, annuitization options, and policy loans – from, or otherwise exchange, their policies.[74] While policyholders can seek a Court-approved financial hardship exemption, this process includes submitting, at a minimum: (1) a notarized or certified statement of facts based on proven financial need; (2) proof or evidence supporting the certified statement; and (3) a separate hardship request form. This sets an exceptionally high bar for exemption, and even if successful, will not necessarily provide applicants with the full value of their Phoenix Products.[75]

106. To add insult to injury, even in instances where PHL policies had positive values where ***no*** premium payments were required to keep the policy in force – Nassau and/or Nassau Affiliates sent, and following the Rehabilitation, continued to send, regular premium "due" notices from a collection of different entities and addresses to certain Plaintiffs and Class Members attempting to collect payments from policyholders with "policy protector riders." Policy protector

---

[72] *See* 26 U.S.C. §1035.

[73] *Supra* ¶9.

[74] Dkt. #101.86, *supra* n.64.

[75] *E.g.*, Ex. A, *When Wall Street's Insurance Playbook Goes Wrong*, *supra* n.3 (noting that the program had allowed just 191 payments for a total of about $5.4 million (or just over $28,272 per payment), with one applicant "who spent weeks working on her application . . . receiv[ing] a letter saying her request was denied," and recalling that "[i]t seemed to be sort of my last hope . . . And they weren't interested.").

riders help prevent a policy from lapsing when its cash value is insufficient to cover monthly charges, as long as the policyholder satisfies the rider's required premium or funding test.

107. These communications with certain Plaintiffs and Class Members were additionally misleading for affirmatively implying that continued payments were required to keep Class Members' policies from lapsing when, to the shock of many of these policyholders, no such payments were in fact required. While some annual and/or other policy summaries may have buried in fine print that these policies would remain in force absent the payment of future premiums, the subsequent routine communications with prominent premium (or deposit) "due" demands contradicted those disclosures and implied that policyholders were required to make payments that were due in order to keep their policies in force.

108. For example, as early as March 6, 2017, the Berger Policy had a policy protector value of $1,315,701 and $10,000,000 in benefits that could have been kept in force with no additional premiums so long as this policy protector value, less any debt, was greater than zero. At no point from March 6, 2017, through March 7, 2026, was the Berger Policy's policy protector value, less any debt, less than zero. Nassau, as the policy servicer, failed to adequately inform plaintiff The Berger Siblings Trust (and numerous other Class Members), about policy protector benefits, or otherwise implied payment was "due" when it was not.

109. Below is an illustrative sample of a "Reminder of Deposit Due" communication sent to plaintiff The Berger Siblings Trust via U.S. Mail which includes a Nassau letterhead, but provides a return address for NNY, NLA, and PHL in Dallas, Texas. This communication was sent prior to the Rehabilitation and failed to disclose information regarding PHL's financial condition, claims-paying ability, or the increased risk to the policy. Despite demanding an "Amount Due" of $130,199.00, under the active policy protector rider, no payments were in fact required at the time of this communication in order to keep the policy active. Similar communications were sent to The Berger Siblings Trust and other Plaintiffs and Class Members during the Class Period.[76]

---

[76] The "Class Period" begins on January 1, 2020, and continues to the present. *See infra* ¶126.

NASSAU RE

Nassau Life Insurance Company
Nassau Life and Annuity Company
PHL Variable Insurance Company
PO Box 850694
Dallas, TX 75265-0694

**Reminder of Deposit Due**

UNIVERSAL LIFE

| Name | Policy Number | Billing Date | Billing Due Date | Frequency | Amount Due |
|---|---|---|---|---|---|
| PSULW/GUARANTEE | [redacted] | 02/15/2021 | 03/07/2021 | ANNUAL | 130,199.00 |

BERGER SIBLINGS TRUST J, K, K BERGER AS TTEES
[redacted] [redacted]

Agent Name                Agent Address

For Customer Service, please call Client Services at (800)-541-0171 or write to us at the above address. Customer Service Representatives are available Monday through Friday from 8:30 AM to 6:00 PM EST.

Please Keep This Portion For Your Records

H2940A 10-19

H2940A 10-19

Please Return This Portion With Your Payment In The Enclosed Envelope

NASSAU RE

Nassau Life Insurance Company
Nassau Life and Annuity Company
PHL Variable Insurance Company
PO Box 850694
Dallas, TX 75265-0694

**Reminder of Deposit Due**

UNIVERSAL LIFE

| Name | Policy Number | Billing Date | Billing Due Date | Frequency | Amount Due |
|---|---|---|---|---|---|
| PSULW/GUARANTEE | [redacted] | 02/15/2021 | 03/07/2021 | ANNUAL | 130,199.00 |

Make checks payable to: Nassau Re                Please enter amount enclosed $ ________.

| NEW Mailing Address (Include No., Street) (Please print) | City | State | Zip Code |
|---|---|---|---|
| | | | |

[redacted]

110. Below is a similar example of a "Reminder of Deposit Due" communication, also demanding an "Amount Due," sent to plaintiff The Berger Siblings Trust via U.S. Mail from PHL (with Nassau letterhead), but lists a PHL return address in Topeka, Kansas. ***Following*** the Rehabilitation (now liquidation) proceeding, Defendants prominently disclosed that "[i]f your policy is being kept in force under the secondary guarantee feature via the Policy Protector [rider], a premium payment may not be required at this time." This disclosure post-Rehabilitation stands in stark contrast to the ***pre-Rehabilitation*** "Reminder of Deposit Due" communication that omits

such language despite Defendants' unique knowledge of the existential risk to this and similarly situated policies discussed herein.

NASSAU

PHL Variable Insurance Company
PO Box 758573
Topeka KS 66675-8573

**Reminder of Deposit Due**
PSULwG - Survivorship UL with Guarantee

BERGER SIBLINGS TRUST J, K, K BERGER AS TTEES
[redacted]

Paid

| | | | |
|---|---|---|---|
| Policy Number: | [redacted] | Mode: | Annually |
| Billing Date: | February 9, 2026 | Amount Due: | [redacted] |
| Billing Due Date: | March 7, 2026 | | |
| Insured Name(s): | MAUREEN P BERGER<br>DALE L BERGER | | |

If your policy is being kept in force under the secondary guarantee feature via the Policy Protector Test, a premium payment may not be required at this time. Please contact us for specific information regarding your policy.

If you have any questions, please contact your producer. You may also visit our website at www.nfg.com or call us at 1-800-541-0171 and one of our service representatives will be glad to assist you.

Please Keep This Portion For Your Records

---

NASSAU

PHL Variable Insurance Company

**Reminder of Deposit Due**
DETACH AND RETURN WITH PAYMENT

| | | | |
|---|---|---|---|
| Policy Number: | [redacted] | Mode: | Annually |
| Billing Date: | February 9, 2026 | Amount Due: | [redacted] |
| Billing Due Date: | March 7, 2026 | | |
| Insured Name(s): | MAUREEN P BERGER<br>DALE L BERGER | | |

**Please enter amount enclosed $** ____________

Please check here to apply this payment as a loan repayment____________

Please check here for info on automatic monthly payment through Nassau Check-O-Matic Services ____________

MAKE YOUR CHECK PAYABLE TO:
Nassau

AND MAIL TO:
PO Box 758606
Topeka KS 66675-8606

INDICATE ADDRESS CHANGES ON REVERSE SIDE AND CHECK THIS BOX ☐

A070 NASU_PHL 97524762 130,199.00

111. Additionally, Nassau increased cost of insurance (COI) charges on certain policies without informing policyholders. In the 2025 annual statement for The Berger Policy, for example, Nassau deducted $318,828.40 from the policy's cash surrender value without any explanation whatsoever, other than a line entry that read, "Fees/Charges." Discovery will show that, throughout the Class Period, Defendants instituted similarly discreet increased COI charges to many Class Members' policies, as reflected on their annual policy statements.

112. Below is a non-exhaustive sampling of policy statements, statements of value, premium or deposit due notices and reminders, and related communications sent to Plaintiffs by Nassau and/or a litany of Defendants-controlled entities (often with contrasting/obfuscating letterhead and return addresses) that omitted the material risks to Plaintiffs' Phoenix Products, including PHL's significantly deteriorated financial condition and impaired ability to honor policy commitments above the Payment Limits. Plaintiffs were provided similar routine communications during the Class Period. Discovery will show that, throughout the Class Period, Defendants made or caused similar communications to be made to Class Members, including on a monthly, quarterly, and/or yearly basis during the Class Period.

**TABLE OF SAMPLE POLICYHOLDER COMMUNICATIONS**

| DATE | FROM, RETURN ADDRESS | TO | DESCRIPTION |
|---|---|---|---|
| March 25, 2020 | Nassau Re Annuity Operations (with Nassau Re letterhead), Albany, New York | Plaintiff James Scott | Annual Policy Statement providing policy information, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| December 20, 2020 | PHL (with Nassau Re letterhead), Albany, New York | Plaintiff the Albert Siblings | Annual Policy Statement providing policy information, values, transactions and riders, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| February 15, 2021 | NNY, NLA, PHL (with Nassau Re letterhead), Dallas, Texas | Plaintiff The Berger Siblings Trust | Annual Reminder of Deposit Due requesting payment, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments.[77] |
| March 6, 2021 | PHL, Albany, New York | Plaintiff The Berger Siblings Trust | Annual Policy Summary providing policy information, values, transactions and riders, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |

[77] *See supra* ¶109.

| DATE | FROM, RETURN ADDRESS | TO | DESCRIPTION |
|---|---|---|---|
| December 20, 2021 | PHL (with Nassau Re letterhead), Albany, New York | Plaintiff the Albert Siblings | Annual Policy Statement providing policy information, values, transactions and riders, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| February 7, 2022 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff The Berger Siblings Trust | Annual Reminder of Deposit Due requesting payment, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| November 23, 2022 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff the Albert Siblings | Annual Reminder of Deposit Due requesting payment, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| November 24, 2023 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff the Albert Siblings | Annual Reminder of Deposit Due requesting payment, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| February 8, 2024 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff The Berger Siblings Trust | Annual Reminder of Deposit Due requesting payment, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| April 16, 2024 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff James Scott | Annual Policy Anniversary Statement providing policy information, values, transactions and riders, but omitting to disclose PHL's significantly deteriorated financial condition and inability to honor policy commitments. |
| June 5, 2024 | Nassau, Albany, New York | Plaintiff James Rottkamp | Statement of Values providing policy and payment information, but omitting that continued payment of premiums could not assure payment of benefits above applicable Payment Limits. |
| January 5, 2026 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff John Kelleher | Annual Reminder of Deposit Due requesting payment, but omitting that continued payment of premiums |

| DATE | FROM, RETURN ADDRESS | TO | DESCRIPTION |
|---|---|---|---|
| | | | could not assure payment of benefits above applicable Payment Limits. |
| February 9, 2026 | PHL (with Nassau letterhead), Topeka, Kansas | Plaintiff The Berger Siblings Trust | Annual Reminder of Deposit Due requesting payment, but omitting that continued payment of premiums could not assure payment of benefits above applicable Payment Limits.[78] |

113. Ultimately, as a direct result of Defendants' misconduct and failure to adequately warn Class Members about PHL's impending collapse in advance of the Rehabilitation and the material increased risk to the Phoenix Products, and Defendants' continued misrepresentations and omissions following the Rehabilitations, Class Members are unable to obtain the full policy and contract benefits for which they contracted. To this day, Plaintiffs and Class Members are also unable to accurately determine Nassau's own liabilities.

114. Plaintiffs and Class Members will not be made whole by the outcome of the Rehabilitation (now liquidation) proceeding. While the Commissioner purports to be pursuing certain third-party claims ***on behalf of the estate*** (*i.e.*, PHL, Concord Re, and Palisado Re), Plaintiffs assert independent, non-derivative claims on their ***own behalf*** seeking relief from Defendants (who are non-parties in the Rehabilitation proceeding). The Commissioner contends it is pursuing "potential claims" against Nassau, Golden Gate and certain affiliated entities for breach of contract, breach of fiduciary duty, or fraudulent or avoidable transfer. Plaintiffs do not seek relief under any of these theories of liability, and do not seek to recover property or assets belonging to PHL, Concord Re, or Palisado Re.

115. While Defendants knowingly and willingly failed to disclose critical information about PHL's deteriorating financial condition and insolvency while reaping the financial benefits from the Acquisition and subsequent financial maneuvering, Plaintiffs and Class Members are left holding the bag, with no adequate means, absent this litigation, of being made whole.

---

[78] *See supra* ¶110.

### G. Defendants Knew PHL Was Failing and that Their Own Misconduct Deceived Plaintiffs and Class Members

116. Defendants designed, approved, funded, and used various transactions to both operate PHL on the one hand and enrich themselves on the other, including, *inter alia*: (1) implementing affiliated reinsurance transactions with Concord Re and Palisado Re; (2) artificially inflating PHL's reserve credit through the Concord Re-Nassau Re Cayman-Palisado Re XOL agreement; (3) terminating PHL's capital backstop; (4) deconsolidating PHL from Nassau; and (5) continuing to service and manage investments for PHL after deconsolidation. Throughout this period, Dominik and Golden Gate remained in control of Nassau and the Nassau Affiliates. Dominik repeatedly affirmed this control to regulators, including in Connecticut, New York and elsewhere, by controlling all of Golden Gate's voting securities from 2016 through the present, and by declaring himself as the "ultimate controlling person" of Nassau.[79]

117. As the sole member of Golden Gate Capital Opportunity Fund, Dominik controlled both Golden Gate and Nassau, and he served as Golden Gate's Founder, Chief Investment Officer, Managing Director, and sole director. According to NLA's 2025 statutory Schedule Y, Dominik was the ultimate controlling party of NFG. And Golden Gate and Dominik were, at all relevant times, the ultimate controlling parties of PHL, Concord Re, Palisado Re, and various other Nassau entities.

118. Dominik signed the Amended Form A on behalf of Golden Gate in connection with the Acquisition of Phoenix and PHL. The Acquisition materials included the CMP that required PHL to maintain its ACL-RBC Ratio at or above 400%, which was pivotal to the Acquisition because Defendants were seeking regulatory approval to acquire and control an insurer whose liabilities consisted of promises to pay policyholders and annuity holders. After the Acquisition, Golden Gate and Nassau did not operate PHL as a separate, independent insurer with its own employees and independent operations. Indeed, by the time PHL entered Rehabilitation, it and its

---

[79] *E.g.*, Financial Condition Report on Examination of the Nassau Life Insurance Company as of December 31, 2022, at 7, available at: https://www.dfs.ny.gov/system/files/documents/2026/02/67814fc22.pdf.

captives had no employees other than officers. Nassau and its Affiliates provided services to PHL under administrative, investment, and shared-services agreements that covered all day-to-day operations of PHL, Concord Re, and Palisado Re. Through those agreements and control relationships, Defendants controlled the policy servicing, asset management, accounting, reinsurance, and communications through which Plaintiffs and Class Members were told to continue funding their Phoenix Products.

119. By March 31, 2023, the CID placed PHL and its captive reinsurers under administrative supervision as PHL's overall capital deficit approached $1 billion.[80] As part of this supervision, the CID ordered outside actuarial counsel to provide projections on PHL's financial health. The projections predicted that PHL assets would be exhausted by 2030, with ***$1.46 billion in unfunded liabilities*** – *i.e.*, policyholder liabilities that "will remain unpaid," according to the CID – implying a then-current capital and surplus of approximately ***negative $900 million***.[81]

120. Implicit in this supervision and warning, Defendants necessarily knew – as they already had since at least November 2021 – that: (1) PHL was in imminent, fatal danger of not meeting projected policyholder obligations; (2) continued capital extraction, including Nassau's own servicing and management fees, would exhaust PHL assets completely; and (3) without action from Defendants, rehabilitation was all but inevitable. Despite this, Defendants refused to provide additional operating capital for PHL.

121. Defendants also knew that PHL's public-facing financial condition depended on affiliated reinsurance and circular accounting treatment that did not provide funds actually available to pay claims. These transactions allowed PHL to appear adequately capitalized and to continue operating while Defendants kept collecting servicing and investment-management fees, and Nassau and Golden Gate to eliminate the original capital-support framework. Dominik and

---

80 Throughout this supervision, Defendants continued to collect significant annual premiums from Plaintiffs and Class Members in the state of California (among others), even exceeding $150 million for California alone by 2024. *See supra* n.6.

81 Kerry Pechter, *Double Trouble in the Bermuda Triangle*, Retirement Income Journal (May 30, 2024), available at: https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle.

Golden Gate necessarily knew of these transactions because they were the same transactions through which they reduced their capital obligations, moved PHL out of Nassau's consolidated structure, and continued to control the entities servicing and administering the Phoenix Products.

122. Moreover, the release from the CMP, the creation and use of Concord Re and Palisado Re, the XOL novation, and the deconsolidation of PHL were regulator-facing transactions involving PHL's capital position, RBC treatment, reinsurance credit, and ability to meet policyholder obligations – matters that could not have been undertaken without the knowledge, approval, or oversight of Golden Gate and Dominik, the ultimate controlling persons who had committed capital to Nassau, signed the Acquisition filings, controlled Nassau and the Affiliates, and remained in control of the post-deconsolidation ownership structure.

123. By the start of the Class Period on January 1, 2020, Defendants already knew that the assurances given at the Acquisition were no longer true. Indeed, in November 2019, Nassau declared the CMP "null and void," replacing its commitment to maintain PHL's ACL-RBC ratio at or above 400% with a one-time $50 million capital contribution and an assurance that PHL would meet a 200% threshold. That same month, PHL stopped selling new business, and it ceased issuing new policies at year-end 2019. To place PHL into run-off, Defendants designed and approved related-party transactions closing at year-end 2019 that ceded 100% of PHL's retained risk to Concord Re, backed by an XOL agreement with Nassau Re Cayman.

124. Defendants therefore knew, because they structured these transactions themselves, that PHL's retained risk had not left the corporate family, that PHL's reported capital position now depended on an affiliate's contingent reinsurance promise rather than on parental capital support, and that the backstop originally promised to regulators and policyholders no longer existed. Defendants also knew that PHL's condition had deteriorated sharply: ***in 2019 alone, PHL added approximately $4 billion of affiliated reinsurance***, and S&P downgraded PHL five notches to CCC+, citing a $100 million decline in capital adequacy.

125. By 2021, the same sequence of transactions that removed PHL from Nassau's balance sheet also left PHL dependent on affiliated reinsurance and captive arrangements that did not provide third-party capital available to pay claims. Based on PHL and Nassau's 2021 statutory

statements, the request for release from the CMP, and the deconsolidation of PHL, it was apparent that Nassau knew PHL was doomed to fail as early as November 2021 and was trying to avoid obligations to keep PHL solvent. Defendants nevertheless continued to permit Class Members to receive policy statements, premium due notices, statements of value, annual policy communications, deposit reminders, and related communications that conveyed "business as usual."

## V. CLASS ACTION ALLEGATIONS

126. The "Class Period" begins on January 1, 2020, and continues to the present. Should discovery reveal additional conduct, communications, knowledge, or resulting injury supporting an earlier commencement date for the Class Period, Plaintiffs reserve the right to seek amendment thereof. Plaintiffs do not seek recovery from PHL or the Rehabilitation estate, challenge the Rehabilitator's administration of the estate, or seek damages based solely on actions taken by the Rehabilitator.

127. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23 ("Rule"), on behalf of the below-defined classes:

> **The Nationwide Class**: All persons and entities who owned or maintained rights under life insurance policies or annuities issued by PHL (the "Phoenix Products") as of May 20, 2024, with benefits or values in excess of the Payment Limits imposed by the Rehabilitation or applicable SGAs, and were sent policyholder communications by Nassau or its affiliates, predecessors, or successors. The class includes all Phoenix Products for which a claim or benefits were paid in the Rehabilitation, and Phoenix Products that have lapsed or were surrendered since May 20, 2024.

> **The California Subclass**: All persons and entities in California who owned or maintained rights under life insurance policies or annuities issued by PHL (the "Phoenix Products") as of May 20, 2024, with benefits or values in excess of the Payment Limits imposed by the Rehabilitation or applicable SGAs, and were sent policyholder communications by Nassau or its affiliates, predecessors, or successors. The class includes all Phoenix Products for which a claim or benefits were paid in the Rehabilitation, and Phoenix Products that have lapsed or were surrendered since May 20, 2024.

> **The New York Subclass**: All persons and entities in New York who owned or maintained rights under life insurance policies or annuities issued by PHL (the "Phoenix Products") as of May 20, 2024, with benefits or values in excess of the Payment Limits imposed by the Rehabilitation or applicable SGAs, and were sent policyholder communications by Nassau or its affiliates, predecessors, or

successors. The class includes all Phoenix Products for which a claim or benefits were paid in the Rehabilitation, and Phoenix Products that have lapsed or were surrendered since May 20, 2024.

**The Illinois Subclass**: All persons or entities in Illinois who owned or maintained rights under life insurance policies or annuities issued by PHL (the "Phoenix Products") as of May 20, 2024, with benefits or values in excess of the Payment Limits imposed by the Rehabilitation or applicable SGAs, and were sent policyholder communications by Nassau or its affiliates, predecessors, or successors. The class includes all Phoenix Products for which a claim or benefits were paid in the Rehabilitation, and Phoenix Products that have lapsed or were surrendered since May 20, 2024.

**The Connecticut Subclass**: All persons or entities in Connecticut who owned or maintained rights under life insurance policies or annuities issued by PHL (the "Phoenix Products") as of May 20, 2024, with benefits or values in excess of the Payment Limits imposed by the Rehabilitation or applicable SGAs, and were sent policyholder communications by Nassau or its affiliates, predecessors, or successors. The class includes all Phoenix Products for which a claim or benefits were paid in the Rehabilitation, and Phoenix Products that have lapsed or were surrendered since May 20, 2024.

128. The Class and Subclasses are collectively referred to as the "Classes."

129. Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed or refined at class certification.

130. Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

131. **Numerosity**: The members of the Classes are so numerous that joinder of all members is impractical, which, upon information and belief, number in the thousands. As of December 31, 2025, PHL had over 62,000 life policies and annuity contracts in force. Among PHL's largest life insurance blocks by death benefit is its UL block, comprising approximately 8,000 active policies. Of these policies, approximately sixty percent (60%) have death benefits at or below the applicable SGA limit, while the remaining approximately forty percent (40%), or approximately 3,200 policies, exceed it. PHL's insolvency and the expected order of liquidation

are detrimental to the holders of these over-the-cap UL policies, as well as to holders of all other affected over-the-cap term life and other life insurance policies and annuity contracts. Indeed, as of March 31, 2026, PHL owed approximately $711.3 million in death claims exceeding the Moratorium limits on claims already paid up to those limits.

132. **Commonality**: There are questions of law and fact common to the Classes because Class Members' claims are identical to one another and are predicated on the common contention that they were injured by having been solicited, induced, and/or targeted by Defendants' treatment of PHL, including the opaque, misleading, and circular reinsurance and transactions used to facilitate Defendants' scheme and that were orchestrated by Defendants for their sole and exclusive benefit to the detriment of PHL and PHL policyholders. The financial alchemy described above and misleading policy and annuity holder communications caused immediate and imminent harm to the Plaintiffs and Class Members and masked known troubles at PHL. Through this course of action, Defendants committed civil RICO violations, violated state consumer protection and/or statutory laws, and committed common law violations. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include, but are not limited to:

(a) Whether Defendants purposefully, intentionally, or negligently violated the law in choosing not to properly notify, or otherwise by misleadingly communicating with, Class Members about PHL's financial strength, claims-paying ability, or the increased risk to Class Members' policies;

(b) Whether Defendants purposefully, intentionally, or negligently misrepresented, concealed, suppressed, or omitted information concerning PHL's financial strength, claims-paying ability, or the increased risk to Class Members' policies;

(c) Whether Defendants fraudulently induced Class Members to maintain their Phoenix Products by failing to disclose PHL's financial strength, claims-paying ability, or the increased risk to Class Members' policies;

(d) Whether Defendants wrongfully collected compensation and profits in connection with their ownership of PHL;

(e) Whether the policy statements, premium due notices, and related communications sent to Class Members were materially uniform in content and omitted the same material facts about PHL's financial condition;

(f) Whether premium and "deposit due" notices and reminder sent to holders of policies with active policy protector riders falsely represented that payments were required to keep those policies in force;

(g) Whether the omitted facts were material to a reasonable policyholder or annuity holder deciding whether to continue paying premiums or to surrender, withdraw, or exchange a Phoenix Product;

(h) Whether Defendants knew, or recklessly disregarded, that the CMP had been terminated, that PHL had entered run-off, and that PHL's reported capital position depended on affiliated captive reinsurance and affiliates' XOL agreement;

(i) Whether Defendants had a duty to disclose the omitted facts because of their superior knowledge, their partial statements in policyholder communications, or the standards of conduct in applicable state insurance codes;

(j) Whether Golden Gate and Dominik controlled Nassau and the servicing, administration, and communications functions through which those communications were prepared and sent;

(k) Whether Class Members were injured by paying premiums, deposits, and charges, by losing surrender, withdrawal, and exchange options, and by losing over-the-cap value they would have preserved had the truth been disclosed;

(l) The proper form of equitable relief; and

(m) The proper measure of monetary relief.

133. **Typicality**: The named Plaintiffs' claims are typical of the Class's claims. The named Plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

134. **Adequacy**: The named Plaintiffs will fairly and adequately protect the interests of the Class. The named Plaintiffs have no interest antagonistic to those of the other Class Members.

The named Plaintiffs are committed to the vigorous prosecution of this action. They have retained counsel who are experienced and competent in the prosecution of large complex and consumer class actions.

135. **Rule 23(b)(1)**: The prerequisites for a Rule 23(b)(1) class are satisfied. Prosecution of separate actions by Class Members would risk establishing incompatible standards of conduct for Defendants. Additionally, adjudications as to individual Class Members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

136. **Rule 23(b)(3)**: The prerequisites for a Rule 23(b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class wide proof. Class wide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class Members' claims in one action.

## VI. THE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

137. Any applicable statutes of limitation have been tolled by Defendants' affirmative and intentional acts of fraudulent concealment, misrepresentations, nondisclosures, and denial of the factual record as alleged above.

138. Instead of disclosing the truth about PHL's deteriorating financial status and the resulting increased risks to Class Members' Phoenix Products, Defendants continued to communicate with Plaintiffs and Class Members as if PHL, and the entities charged with administering the Phoenix Products (*i.e.*, Nassau, and by virtue of their control of Nassau, Golden Gate, and Dominik), as if PHL maintained sufficient operating capital to pay its policy obligations. The extent of the fraud perpetrated by Defendants only began to be revealed to the public once the Rehabilitation petition was filed in May 2024. To the extent Class Members were made aware of the Rehabilitation, this, for the first time, provided information to Class Members regarding not only PHL's financial peril, but the resulting financial harm to Class Members and their Phoenix Products.

139. Defendants' other acts of intentional concealment from both Class Members and regulators include, but are not limited to: (1) masking PHL's deteriorating financial condition through sham captive reinsurance transactions, XOL agreements, unlawful participation in STOLI agreements and the Buyback Program, and restructuring of PHL, Nassau, and related entities; (2) cancelling the CMP that ultimately eliminated PHL's capital backstop; (3) deconsolidating Nassau from PHL; and (4) sending premium due and other routine communications and statements to Plaintiffs and Class Members after the material increased risk to their policies and PHL's increasing financial deterioration was known to Defendants, that failed to disclose these facts and otherwise conveyed that PHL would be in a position to pay its obligations over the Payment Limits.

140. Defendants' acts of concealment took multiple forms, some of which are currently unknown to Plaintiffs because such acts of concealment are within the exclusive knowledge of Defendants. Plaintiffs are unable to allege in full each act of concealment or Class Member communication that Defendants have issued or facilitated because Plaintiffs do not have access to all of this information. Other specific examples of Defendants' material fraudulent misrepresentations, concealment, and/or omissions include, but are not limited to, the acts set forth above, *supra* §IV., which are alleged and relied upon here as if fully set forth herein.

141. Defendants' post-Rehabilitation conduct confirms the continuing nature of the concealment. Even after the Rehabilitation commenced, Class Members continued receiving policyholder communications, including statements of value, annual policy anniversary statements, and deposit or premium reminders, that provided policy and payment information while omitting PHL's materially deteriorated financial condition and inability to honor policy commitments above the Payment Limits. In some instances, those communications demanded or implied that payments were due to maintain policies even where policy features meant no such payments were required to keep the policies in force. These communications continued the same course of conduct: Defendants concealed the truth, preserved premium and fee flows, and prevented Class Members from making informed decisions about whether to surrender, exchange, withdraw, or otherwise protect the value of their Phoenix Products.

## VII. CAUSES OF ACTION

### COUNT I

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c)-(d), Against All Defendants

142. Plaintiffs re-allege and incorporate herein by reference all foregoing and subsequent allegations.

143. Plaintiffs bring this action on behalf of the Nationwide Class.

144. This claim arises under 18 U.S.C. §§1962(c) and (d), which provide in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

145. Defendants engaged in a deceptive scheme and common course of conduct to obtain and retain Class Members' money and preserve the resulting stream of premiums, interest payments, servicing fees, and other revenues by causing Plaintiffs and Class Members to continue funding and retaining their policies through materially misleading policy statements, premium notices, statements of value, deposit reminders, annual policy communications, and related mail and wire communications. Those communications concealed material facts known to Defendants concerning PHL's financial risks and claims-paying ability and were intended to prevent Plaintiffs and Class Members from surrendering, exchanging, replacing, withdrawing, or otherwise protecting the value of their policies before those options became unavailable or materially impaired.

146. At all relevant times, Golden Gate, Nassau, and Dominik were "persons" within the meaning of 18 U.S.C. §1961(3), because each Defendant was an individual or "capable of holding a legal or beneficial interest in property[.]"

147. Golden Gate and Dominik created NIGH (formerly Nassau Re at the time of the Acquisition) to acquire Phoenix, including PHL. NFG, which was created in 2018, became the

parent company of NIGH and oversaw the administration and handling of PHL policies and claims. NIGH exercised ownership, governance, and strategic oversight of PHL and the administration of the Phoenix Products before deconsolidation as the direct owner of PHL Delaware (the parent of PHL), and afterward, as a commonly controlled Nassau affiliate that continued coordinating with NFG regarding PHL's policies and operations. Together, NIGH and NFG (collectively, in this context, the "Nassau Enterprise") constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4), through which Defendants conducted the pattern of racketeering activity described herein.

148. Defendants operated the Nassau Enterprise to coordinate and administer the Phoenix Products and to protect Defendants' financial interests by concealing PHL's deteriorating condition and the increased risk to policyholders, thereby inducing policyholders and annuitants to retain their policies and continue paying premiums, policy chargers, and other amounts.

149. Alternatively, Nassau and certain of its affiliates, including third parties NCNY, NNY, NLA, NAMCO, Nassau Re Cayman, DSM Sands, Westgate, and Magni Re (the "Nassau Affiliates Enterprise") were involved in the deceptive scheme discussed herein and constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4), through which Defendants conducted the pattern of racketeering activity described herein.

150. The Nassau Affiliates Enterprise functioned as a continuing unit to administer and preserve the Phoenix Products and to structure and carry out coordinated administrative, investment-management, reinsurance, financing, and policy-acquisition arrangements relating to the Phoenix Products, in a manner that maintained premium and fee revenues and protected Defendants' financial interests, including by withholding material information concerning PHL's deteriorating condition and the increased risk to policyholders, thereby inducing policyholders to retain their policies and continue making premium payments. The non-defendant Nassau Affiliates participated in the Enterprise by performing the administrative, servicing, asset-management, reinsurance, financing, policy-acquisition, and communications functions through which Defendants maintained control over PHL-related business and preserved premium, interest, servicing-fee, management-fee, and other revenue streams.

151. Alternatively, third-party PHL individually constitutes an enterprise within the meaning of 18 U.S.C. §1961(4), through which Defendants conducted the pattern of racketeering activity as described herein (the "PHL Enterprise"). The PHL Enterprise engaged in the issuance, administration, maintenance, and runoff of the Phoenix Products affecting interstate commerce. Defendants associated with PHL and, through their ownership, governance, administrative authority, common personnel, service arrangements, and control over policyholder communications, directly or indirectly participated in the operation and management of PHL's affairs.

152. Defendants used PHL's ordinary policy-administration, premium-billing, customer-service, and communications functions as the means and instrument through which they executed the alleged pattern of mail and wire fraud discussed below, including communicating or causing the communications with policyholders, collecting or causing the collection of premium payments, and maintaining or causing the maintenance of the affected policies and contracts.

153. The Nassau Enterprise, Nassau Affiliates Enterprise, and PHL Enterprise are referred to collectively, where appropriate, as the "Enterprise."

154. Defendants at all relevant times exercised substantial control over the Enterprise and its business and affairs, though, among other methods and means, the following:

(i) Golden Gate's and Dominik's creation, funding, and control of NIGH and NFG;

(ii) Defendants' execution of the Acquisition;

(iii) NIGH's ownership, governance, and strategic oversight of PHL before deconsolidation;

(iv) Defendants' control over Nassau, the Nassau Affiliates, and PHL;

(v) Defendants' termination of the CMP and creation or use of affiliated captive reinsurers;

(vi) Defendants' deconsolidation of PHL from Nassau while preserving Nassau's servicing and fee streams; and

(vii) Defendants' continued control over policyholder communications, premium collection, and policy administration.

155. The Enterprise had ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts. The Enterprise is separate and distinct from each Defendant. Golden Gate is an entity distinct from Nassau, PHL is a distinct entity from Golden Gate and Nassau, and Golden Gate, Nassau, and PHL are distinct from the Nassau Affiliates. Dominik, in turn, is an individual who is distinct from Golden Gate, Nassau, PHL, and the Nassau Affiliates, even if Dominik is a controlling party of those entities.

156. Defendants conducted and participated in the Enterprise's affairs through a scheme to obtain and retain policyholders' money and preserve the resulting stream of premiums, charges, servicing fees, and other revenues by causing Plaintiffs and Class Members to continue funding and retaining their policies through materially misleading policy statements, premium notices, and related communications. Those communications concealed material facts known to Defendants concerning the financial risks affecting Plaintiffs' policies, misrepresented PHL's ability to provide the benefits for which Plaintiffs and Class Members contracted, and concealed Defendants' participation in the scheme and were intended to prevent Plaintiffs from surrendering, exchanging, replacing, or otherwise protecting the value of their policies before those options became unavailable or materially impaired.

157. The Enterprise engaged in, and its activities affected, interstate and foreign commerce by presenting false information to Plaintiffs and Class Members through the dissemination of misleading statements and communications over mail and the internet, and through the collection of premium payments maintaining policy rights over mail and/or the internet, throughout the United States.

158. Within the Enterprise, there was a common communication network through which Defendants and their co-conspirators shared information regarding PHL, the Phoenix Products, policy administration, premium payments, policy charges, reinsurance, servicing, asset management, and PHL's deteriorating financial condition. The Enterprise used this network to coordinate the misleading communications and omissions alleged herein.

159. Each participant in the Enterprise had one shared purpose and a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Enterprise, Dominik, Golden Gate, Nassau, PHL, and/or the Nassau Affiliates functioned as a continuing unit, each with distinguishable conduct that assisted and furthered the deceptive scheme.

160. Defendants have committed, conspired to commit, or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343, within the past ten years. The multiple acts of racketeering activity that Defendants committed and/or conspired to commit, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity and have continued even after the Rehabilitation, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Enterprise, and began no later than the start of the Class Period.

161. Throughout the scheme, Defendants exerted substantial control over the Enterprise and directed or participated in the conduct of the Enterprise's affairs by, among other things, causing or permitting misleading policy statements, premium notices, statements of value, annual policy communications, and related mail and wire communications to be sent to Plaintiffs and Class Members, while continuing to collect or cause the collection of premiums, policy charges, servicing fees, and other revenues tied to over-the-cap policies.

162. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

163. **Mail Fraud under 18 U.S.C. §1341**: through the repeated mailing of policy statements, statements of value, annual policy communications, premium due notices, deposit reminders, and related communications that omitted material information about PHL's financial condition, claims-paying ability, and the increased risk to Plaintiffs' and Class Members' Phoenix Products; and

164. **Wire Fraud under 18 U.S.C. §1343**: through the use of interstate wires, electronic communications, websites, online servicing systems, electronic policy statements, electronic premium or deposit notices, and electronic payments to transmit or collect policyholder information and payments while omitting the same material facts.

165. Many of the precise dates and details of the Enterprise's use of the mails and wires fraud cannot be ascertained without access to Defendants' books and records. Indeed, the success of Defendants' scheme depended upon secrecy, and Defendants have withheld from Plaintiffs and Class Members the full scope of the communications, billing systems, servicing systems, and payment channels used to execute the scheme. Generally, however, Plaintiffs have described specific categories and examples of the mail and wire communications at issue.[82]

166. Defendants obtained money and property from Plaintiffs and Class Members because of these statutory violations. Plaintiffs and Class Members have been injured in their business or property by Defendants' mail and wire fraud, including through premiums, policy charges, and other amounts paid or retained because of Defendants' fraudulent communications and concealment, and through the resulting loss or diminution of their individual contractual rights.

167. In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as alleged herein. Various other persons, firms, and corporations, not named as defendants in this complaint, may have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.[83]

168. Defendants also used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in the execution of the scheme. The Enterprise's use of the mails and wires included, but was not limited to, the transmission, delivery, or shipment of the following policyholder-facing materials and payments that were foreseeably caused to be sent as a result of the scheme:

(i) documents concerning Plaintiffs' and Class Members' Phoenix Products, including policy billings, statements of value, annual policy communications,

---

[82] *See, e.g.*, Table of Sample Policyholder Communications, *supra* ¶112.

[83] These entities include, but are not limited to, KPMG, AIC, and Fortress.

premium due notices, deposit reminders, interest bills, and other policyholder communications;

(ii) electronic communications, website materials, online account information, and customer-service communications concerning the Phoenix Products, PHL's financial condition, or policyholders' payment obligations; and

(iii) checks, ACH transfers, wire transfers, credit card payments, and other payment transmissions from Plaintiffs and Class Members or their representatives to PHL, Nassau, or the Nassau Affiliates.

169. Based on information and belief, Dominik, Golden Gate, Nassau (or its agents), the Nassau Affiliates, and/or PHL, for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, documents and other things including the billings, statements, communications, and riders described above and referred to in ¶¶103-115, above.

170. Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Among other things, Nassau, PHL, and/or the Nassau Affiliates, under the direction and control of Dominik, Golden Gate, and Nassau, made or caused statements about PHL, the Phoenix Products, policy values, payment obligations, and PHL's financial condition on websites, in emails, through online servicing systems, in regulatory filings used to support PHL's apparent solvency, and in other electronic communications that omitted material facts concerning the causes, extent, and impact of the Enterprise's dealings with PHL and the associated risks to Plaintiffs' and Class Members' Phoenix Products.

171. Defendants devised and knowingly carried out a scheme and/or artifice to defraud by making and/or causing the dissemination of materially false or fraudulent pretenses, representations, promises, or omissions of material facts through Nassau, PHL, and/or the Nassau Affiliates. Defendants fraudulently induced the continued payment of premiums, interest, deposits, policy charges, and other amounts by Plaintiffs and Class Members through the conduct of the Enterprise. For the purpose of executing the scheme, Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

172. Plaintiffs and the Class have been injured in their property because of Defendants' violations of 18 U.S.C. §§1962(c) and (d), including premiums and policy charges paid or retained because of Defendants' fraudulent communications and concealment, and the resulting loss or diminution of their individual contractual rights, including all or part of the face amount and other benefits for which they paid (*e.g.*, the values of the Phoenix Products in excess of the limits imposed by the Moratorium Order and applicable Payment Limits).

173. These are policyholder-specific damages sought from Defendants as compensation for injuries caused by their racketeering conduct—not estate assets, enforcement of claims against PHL, or recovery on behalf of PHL or the Rehabilitator.

174. In the absence of Defendants' violations of 18 U.S.C. §§1962(c) and (d), Plaintiffs and the Class Members (through their Phoenix Products) would not have been similarly harmed. The injuries suffered by Plaintiffs and Class Members were directly and proximately caused by Defendants' racketeering activity.

175. Under the provisions of 18 U.S.C. §1964(c), Plaintiffs seek to recover treble damages, the costs of bringing this suit, and reasonable attorneys' fees. Defendants are accordingly liable to Plaintiffs and Class Members for three times their actual damages as proven at trial plus interest, attorneys' fees, and other relief that the Court may deem just and proper.

**COUNT II**

**Fraudulent Concealment,**
**Against All Defendants**

176. Plaintiffs re-allege and incorporate herein by reference all foregoing and subsequent allegations.

177. Plaintiffs bring this cause of action on behalf of the Nationwide Class.

178. Defendants fraudulently concealed material facts concerning PHL's financial condition, claims-paying ability, and the increased risk that Plaintiffs' and Class Members' Phoenix Products would not be paid or honored above the Payment Limits, while continuing to cause policyholder communications that conveyed "business as usual" and omitted those facts.

179. Defendants each possessed knowledge, intent, and awareness of the harms inflicted upon Plaintiffs and Class Members. This is evidenced by the lengths Defendants took to delay disclosure of and conceal PHL's true financial condition and the associated risks to the Phoenix Products, including by communicating with Plaintiffs and Class Members through routine policyholder communications, statements of value, annual policy statements, premium or deposit due notices or reminders, and by collecting or causing the collection of premiums and charges from Plaintiffs and Class Members as if the risk to the Phoenix Products had not changed.

180. Defendants, through PHL and Nassau, created Concord Re in 2019 and executed the Concord Treaty and related XOL arrangements with Nassau Re Cayman to make PHL appear sufficiently capitalized while concealing its dependence on affiliated captive reinsurance and the resulting risk to policyholders and annuitants.

181. Defendants, through Nassau and Phillip Gass, also cancelled the capital backstop (CMP) created at the Acquisition, eliminating the continuing capital support that regulators and policyholders had been told would protect PHL. After PHL stopped writing new Phoenix Products at the end of calendar year 2019, Golden Gate and Nassau continued administering and servicing the existing Phoenix Products, and collecting or causing the collection of premiums and charges, without disclosing the increased risk to Plaintiffs' and Class Members' policies.

182. Defendants moved PHL off of the Nassau balance sheet at year-end 2021, separating PHL from Nassau's stronger business while continuing to preserve the Nassau-controlled servicing and administration structure that sent the policyholder communications described herein.

183. These facts show, as described above, that Defendants knew about the material increased risk to Plaintiffs' and Class Members' policies by the beginning of the Class Period, and "knew that PHL was doomed to fail as early as November 2021 and it was trying to avoid having to comply with its obligations to keep PHL Variable solvent,"[84] yet concealed that knowledge and the resulting risk to the Phoenix Products from Plaintiffs and Class Members.

---

[84] Gober Dec. at 6-7, *supra* n.36.

184. These facts were concealed to induce the continued payment of premiums and charges by Plaintiffs and Class Members and to prevent them from surrendering, withdrawing, exchanging, replacing, or otherwise protecting the value of their Phoenix Products before those options became unavailable or materially impaired.

185. Defendants concealed these facts and engaged in fraudulent conduct with the intent to defraud and/or deceive Plaintiffs and Class Members. While continuing to hold PHL (including through Nassau) out through policyholder communications as a functioning insurer capable of paying claims related to the Phoenix Products, Defendants suppressed material facts concerning PHL's true financial condition, claims-paying ability, capital support, affiliated reinsurance, and increased risk of nonpayment above the Payment Limits.

186. Plaintiffs and Class Members relied upon Defendants' concealment described above, which conveyed business as usual with respect to the Phoenix Products and created the false impression that Plaintiffs' and Class Members' contracted-for benefits remained intact and without material risk that PHL could not honor its commitments. Plaintiffs and Class Members were thereby induced to continue paying premiums and charges and to continue maintaining their Phoenix Products leading up to and even after the Rehabilitation.

187. Plaintiffs and Class Members had no means to conduct diligence that would have led to the discovery of these fraudulently concealed facts before the Rehabilitation. Before the revelations that came forth in the Rehabilitation, Defendants caused PHL to continue business operations, collected regular premiums and charges on policies, used affiliated reinsurance and accounting transactions to present PHL as financially stable, and otherwise provided no indication of the underlying financial instability. These actions would have thwarted any active or contemplated attempts at investigation.

188. As a result of the concealment alleged above, Plaintiffs and Class Members were financially damaged. Their damages include premiums and charges paid in reliance on Defendants' concealment; the lost value or benefits of their Phoenix Products in excess of the Payment Limits that they would have preserved had the truth been disclosed; and the value of the surrender, withdrawal, exchange, replacement, and other policyholder options they lost. Plaintiffs

therefore demand judgment in the form of compensatory damages, together with all interest, costs, attorneys' fees, and any other relief that the Court may deem just and proper.

**COUNT III**

**Negligent Misrepresentation,**
**Against Golden Gate and Nassau**

189. Plaintiffs re-allege and incorporate herein by reference all foregoing and subsequent allegations.

190. Plaintiffs bring this cause of action on behalf of the Nationwide Class.

191. This claim arises from the policyholder communications that Golden Gate and Nassau made, or caused to be made, to Plaintiffs and Class Members during the Class Period, including annual policy statements, statements of value, notices or reminders of premium or deposits due, and similar routine servicing communications. Through these communications, Golden Gate and Nassau represented that specified amounts were "due" and must be paid to keep the Phoenix Products in force, reported policy and account values as though they were secure, and conveyed that the Phoenix Products remained ongoing, fully supported obligations of a functioning insurer, while omitting the facts necessary to make those statements not misleading.

192. Golden Gate and Nassau owed Plaintiffs and Class Members a duty to exercise reasonable care in making these representations. Nassau and its affiliates, under Golden Gate's and Dominik's control, administered and serviced the Phoenix Products, prepared and sent the communications, and supplied the information in them for the guidance of Plaintiffs and Class Members, a specific and limited group of policyholders, in deciding whether to keep paying, maintain, surrender, withdraw, or exchange their Phoenix Products. Golden Gate and Nassau also possessed superior, and, as a practical matter, exclusive, knowledge of PHL's financial condition, capital support, and affiliated reinsurance. The standard of care is informed by state insurance codes, including Cal. Ins. Code §790.03(a), (b), and (e), which prohibit misrepresenting the benefits of a policy and making misleading statements concerning the financial condition of an insurer, and materially similar provisions of other states. Plaintiffs do not contend that these insurance code provisions create a private right of action.

193. These representations were false or misleading when made. For policyholders with active policy protector riders, no payment was in fact required to keep their policies in force. For all Class Members, the representations conveyed that their policy values and benefits above the Payment Limits were supported by a functioning insurer, when PHL's capital backstop had been terminated, PHL had been separated from Nassau, PHL's reported solvency depended on affiliated captive reinsurance, and the risk of nonpayment above the Payment Limits had materially increased. Because Golden Gate and Nassau chose to speak about, *inter alia*, amounts due, policy values, face amounts, benefits, and other policy-related specifications, their failure to disclose these facts rendered the representations they made misleading.

194. Golden Gate and Nassau made these representations without reasonable grounds for believing them to be true. Golden Gate and Nassau knew or should have known of PHL's growing negative capital surplus, the termination of the CMP, PHL's dependence on affiliated captive reinsurance, and the effect of these facts on PHL's ability to pay claims above the Payment Limits, and they controlled the policy-administration systems that generated premium-due demands to policyholders whose policies/riders required no payment.

195. Golden Gate and Nassau made these representations to induce Plaintiffs and Class Members to continue paying premiums, deposits, and charges and to maintain their Phoenix Products, and knew that Plaintiffs and Class Members would rely on them in making those decisions.

196. Plaintiffs and Class Members justifiably relied on these representations. PHL has not filed public reports under the Securities Exchange Act of 1934 since 2015, and Plaintiffs and Class Members had no independent means of verifying PHL's claims-paying ability or the effect of its affiliated transactions. In reliance on the representations, Plaintiffs and Class Members paid premiums and charges and refrained from surrendering, withdrawing the cash value of, or completing a 1035 exchange of their Phoenix Products while those options remained available.

197. As a direct and proximate result of Golden Gate's and Nassau's negligent misrepresentations and omissions, Plaintiffs and Class Members have been damaged. Their damages include the premiums and charges paid in reliance on Golden Gate's and Nassau's

communications; the lost value or benefits of their Phoenix Products in excess of the Payment Limits that they would have preserved had the truth been disclosed; and the value of the surrender, withdrawal, and exchange options they lost. Plaintiffs request a judgment against Golden Gate and Nassau for damages, attorneys' fees and costs, and any further relief that the Court deems just and proper.

**COUNT IV**

**Violations of California Civil Code §§1709, 1710(4), Promissory Fraud, Against All Defendants**

198. Plaintiff Kelleher re-alleges and incorporate herein by reference all foregoing and subsequent allegations.

199. Plaintiff Kelleher brings this cause of action on behalf of the California Subclass.

200. California Civil Code §1709 provides that willful deceit of another with intent to induce that person to alter his or her position to his or her injury or risk is liable for any damage suffered thereby. California Civil Code §1710(4) defines "deceit," in relevant part, as "[a] promise, made without any intention of performing it."

201. In connection with and following the Acquisition, Defendants made, caused to be made, authorized, ratified, and repeated a series of affirmative promises concerning their future conduct toward PHL and PHL's policyholders, including, without limitation, promises that: (a) Golden Gate's and Nassau's ownership and financial backing would benefit policyholders, accelerate PHL's turnaround, and bolster PHL's financial strength and ratings; (b) Defendants' backing would have a positive impact on PHL's ability to meet the needs of its policyholders; (c) through the CMP, PHL's ACL-RBC ratio would be maintained at or above 400%; (d) Defendants would provide capital support to PHL if the Company's capital ever fell short of that committed level; and (e) policyholder claims and benefits would be honored and were backed by a functional insurer and/or by the Company's financial strength.

202. These promises were definite, affirmative commitments regarding Defendants' own future conduct, made to regulators, the public, and — directly and through PHL, Nassau, and/or the Nassau Affiliates — to plaintiff Kelleher and California Subclass members. These

promises were material, as reasonable policyholders or annuity contract holders, including plaintiff Kelleher, decided to continue paying premiums and deposits into their Phoenix Products. Plaintiff Kelleher and California Subclass members attached importance to whether the owners of the issuing insurer in fact intended to maintain the insurer's wellbeing and to fund any such capital shortfall.

203. Defendants' subsequent conduct confirms that they did not intend to execute their promises. As explained in detail above, *supra* ¶77, in November 2019, Defendants began by causing, approving, and ratifying the termination of the CMP and replacing the 400% ACL-RBC commitment with a one-time capital contribution and a substantially diminished 200% ACL-RBC threshold. Defendants also caused PHL to cease writing new business at year-end 2019. Moreover, Defendants caused PHL's retained risk to cede to Concord Re, PHL's captive reinsurer, supported by an XOL agreement with Nassau Re Cayman. In November 2021, Defendants transferred PHL and its subsidiaries to GG Holding Company and deconsolidated Phoenix from Nassau, leaving no ongoing capital support obligation, even as Nassau and the Nassau Affiliates continued to provide, and to collect fees for, servicing, administrative, and asset management functions. Throughout this period and during the Class Period, Defendants disseminated repeated policy and contract holder communications which established and continued their false promises, including statements of value, annual statements, and notices or reminders of premium or amounts due, that provided policy, benefits and payment information that implied or conveyed that benefits would be honored above the Payment Limits.

204. Defendants made their promises, and caused them to falsely remain in place, with the intent to deceive and to induce plaintiff Kelleher and California Subclass members to refrain from altering their positions to their detriment – specifically, to induce them to continue to maintain, and continue to fund their Phoenix Products, and to forbear from surrendering, withdrawing cash value from, exchanging, replacing, or otherwise acting to protect the value of those products while such options remained available to them.

205. Defendants' willful deceit and promises continued in force throughout the Class Period, and Defendants intended not to keep those promises at the time they were made or caused to be made, and actively caused them to remain in place, through the conduct alleged herein.

206. Defendants possessed and controlled the only reliable source of information regarding their own intentions: concerning PHL's true capital position, the related-party reinsurance, and restructuring transactions described above, and the dismantling of the capital support framework. That information, or the severity of the totality of its impact, was not reasonably available to plaintiff Kelleher and California Subclass members, who had no means of discovering Defendants' contrary intent.

207. Plaintiff Kelleher's and California Subclass members' reliance was reasonable and justifiable. Defendants' promises were made by the owners and controlling persons of the issuing insurer, were presented to insurance regulators in support of approval of the Acquisition, were memorialized in a written capital maintenance framework (the CMP), and were reinforced by Defendants' continuing course of policyholder communications — including periodic policy statements, premium due notices and reminders, and other billing communications — which conveyed that the Phoenix Products remained sound and worth maintaining.

208. As a direct and proximate result of Defendants' false promises, plaintiff Kelleher and California Subclass members have suffered damages, including, without limitation: (a) the premiums and policy charges they paid to maintain their Phoenix Products after the promises were made and in reliance upon them; (b) the loss of surrender, withdrawal, cash value, 1035 exchange, replacement, and other policyholder options that were available to them and that they forwent in reliance on those promises, and that have since been foreclosed; and (c) the loss of policy or contract value and benefits in excess of the Payment Limits that would have been preserved had the truth been disclosed. Plaintiffs and Class Members could not have begun to uncover this truth until the start of the Rehabilitation, in May 2024.

209. Defendants' conduct was willful, and constituted deceit within the meaning of California Civil Code §§1709 and 1710(4). Plaintiff Kelleher and California Subclass members are therefore entitled to recover compensatory damages in an amount to be proven, punitive and

exemplary damages pursuant to California Civil Code §3294, pre- and post-judgment interest, attorneys' fees and costs as permitted by law, and such other and further relief as the Court deems just and proper.

**COUNT V**

**Violation of California Business and Professions Code §17200, *et seq*., Against Golden Gate and Nassau**

210. Plaintiff Kelleher re-alleges and incorporate herein by reference all foregoing and subsequent allegations.

211. Plaintiff Kelleher brings this cause of action on behalf of the California Subclass.

212. Golden Gate and Nassau violated and continue to violate the California Business and Professions Code §17200, *et seq*., through one or more of the following unfair, unlawful or fraudulent practices, resulting in unfair business competition, inclusive:

(a) the repeated communications, via mailings or otherwise, to plaintiff Kelleher and California Subclass members related to the Phoenix Products, including through periodic policy statements, premium due notices or bills, or other communications that omitted material information about PHL or the increased risk to plaintiff and Class Members' Phoenix Products resulting from Golden Gate and Nassau's misconduct, as discussed herein;

(b) the purposeful misrepresentations and omissions of information concerning the Phoenix Products and PHL's financial condition, and/or the resulting increased risk to plaintiff Kelleher's and California Subclass members' Phoenix Products, as discussed herein; and

(c) the wrongful collection or retention of premiums, charges, servicing fees, and other revenues resulting from the misconduct alleged herein.

213. Nassau engaged in the business practices discussed herein by administering and servicing the Phoenix Products, preparing or sending policyholder communications, and collecting or retaining premiums, policy charges, servicing fees, and other revenues from Plaintiffs and Class Members.

214. Golden Gate participated in and controlled those practices by owning and controlling Nassau, controlling PHL through Golden Gate-affiliated funds, and directing or

approving the servicing, administration, billing, and policyholder communications through which the challenged practices were carried out.

215. Plaintiff Kelleher and California Subclass members have been injured by Golden Gate and Nassau's misconduct in that they lost money and/or property as a result of Golden Gate and Nassau's unfair, unlawful or fraudulent acts alleged above, including premiums and charges paid, lost policyholder options, and lost value or benefits of their Phoenix Products in excess of the Payment Limits.

216. Plaintiff respectfully requests that this Court award restitution and other equitable relief available under Cal. Bus. & Prof. Code §17203, award plaintiff Kelleher reasonable attorneys' fees, including under California Code of Civil Procedure §1021.5, and award such other relief that the Court may deem just and proper.

**COUNT VI**

**Violations of New York General Business Law §349,**
**Against Golden Gate and Nassau**

217. Plaintiff the Albert Siblings re-allege and incorporate herein by reference all foregoing and subsequent allegations.

218. Plaintiff the Albert Siblings bring this action on behalf of the New York Subclass.

219. New York General Business Law §349 ("GBL §349") prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

220. As owners and controllers of PHL (which conducts insurance business in New York as described in ¶¶50, 112), Golden Gate and Nassau conducted business, trade, or commerce in New York within the definitions of GBL §349. Golden Gate directed and controlled Nassau's servicing and administration of the Phoenix Products (and controlled PHL through its affiliated funds), including the policy statements and premium notices and reminders sent to New York policy and contract holders. In the conduct of this business, trade, or commerce furnished in New York, Golden Gate and Nassau's actions were directed at consumers of insurance products, including plaintiff the Albert Siblings and New York Subclass members.

221. In the conduct of their business, trade, and commerce in New York, Golden Gate and Nassau engaged in fraudulent activity, which includes, but is not limited to:

(a) the repeated communications, via mailings or otherwise, to plaintiff the Albert Siblings and New York Subclass members related to the Phoenix Products, including through periodic policy statements, premium due notices or bills, or other communications that omitted material information about PHL or the increased risk to plaintiff the Albert Siblings' and New York Subclass members' Phoenix Products resulting from Golden Gate and Nassau's misconduct, as discussed herein;

(b) the purposeful misrepresentations and omissions of information concerning the Phoenix Products and PHL's financial condition, and/or the resulting increased risk to plaintiff the Albert Siblings' and New York Subclass members' Phoenix Products, as discussed herein; and

(c) the wrongful collection or retention of premiums, charges, servicing fees, and other revenues resulting from the misconduct alleged herein.

222. Through this business, trade, or commerce, Golden Gate and Nassau engaged in deceptive acts or practices in violation of GBL §349(a).

223. Golden Gate and Nassau employed these deceptive and misleading acts and practices during the Class Period, to the detriment of plaintiff the Albert Siblings and New York Subclass members.

224. Golden Gate and Nassau willfully engaged in such acts and practices, and knew that they violated GBL §349 or showed reckless disregard for whether they violated GBL §349. As a direct and proximate result of these deceptive acts and practices, plaintiff the Albert Siblings and New York Subclass members suffered actual injury, including premiums and charges paid in reliance on Golden Gate and Nassau's deceptive conduct; the lost value or benefits of their Phoenix Products in excess of the Payment Limits that they would have preserved had the truth been disclosed; and the value of the surrender, withdrawal, exchange, replacement, and other policyholder options they lost.

225. The above deceptive acts and practices caused substantial injury to consumers that they could not reasonably avoid, and that injury outweighed any countervailing benefits to consumers or competition.

226. Golden Gate and Nassau knew or should have known that their course of conduct concerning PHL would mislead plaintiff and Class Members and cause them to continue paying premiums, deposits, interest, and charges and to maintain their Phoenix Products without the information needed to protect their policy values.

227. Plaintiff seeks relief under GBL §349(h), including actual damages, statutory damages, treble damages to the extent authorized by statute, reasonable attorneys' fees and costs, and any other relief that the Court may deem just and proper.

**COUNT VII**

**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, *et seq*.**
**Against All Defendants**

228. Plaintiff The Berger Siblings Trust re-alleges and incorporates herein by reference all foregoing and subsequent allegations.

229. Plaintiff The Berger Siblings Trust brings this action on behalf of the Illinois Subclass.

230. This claim arises under Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, which provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

231. Each Defendant is a "person," as defined by 815 ILCS 505/1(c).

232. Plaintiff The Berger Siblings Trust is a "consumer" within the meaning of Section 815 ILCS 505/1(e).

233. Defendants' conduct, as alleged herein, occurred in the course of trade or commerce within the state of Illinois, including the administration and servicing of the Berger Policy and the

transmission of policyholder and annuitant communications, statements, and premium notices to Illinois policyholders and annuitants, which Golden Gate and Dominik directed and controlled through their ownership and control of Nassau, and PHL through Golden Gate's affiliated funds.

234. Specifically, Defendants engaged in unfair or deceptive acts or practices, including the use or employment of deception, fraud, false pretenses, false promises, misrepresentations or the concealment, suppression or omission of such material facts in the following course of conduct:

(a) the repeated communications, via mailings or otherwise, to plaintiff The Berger Siblings Trust and Illinois Subclass members related to the Phoenix Products, including through periodic policy statements, premium due notices or bills, or other communications that omitted material information about PHL or the increased risk to plaintiff The Berger Siblings Trust's and Illinois Subclass members' Phoenix Products resulting from Golden Gate and Nassau's misconduct, as discussed herein;

(b) the purposeful misrepresentations and omissions of information concerning the Phoenix Products and PHL's financial condition, and/or the resulting increased risk to plaintiff The Berger Siblings Trust's and Illinois Subclass members' Phoenix Products, as discussed herein; and

(c) the wrongful collection or retention of premiums, charges, servicing fees, and other revenues resulting from the misconduct alleged herein.

235. Defendants intended that consumers rely on their deceptive statements, omissions, and practices concerning PHL and the Phoenix Products for Defendants' own financial benefit, and plaintiff The Berger Siblings Trust relied on those statements, omissions, and practices by continuing to pay premiums and charges and by refraining from surrendering, withdrawing the cash value of, completing a 1035 exchange of, replacing, or otherwise protecting the value of the Berger Policy before the Rehabilitation.

236. To the extent 815 ILCS 505/10b applies, the requirement is met because Defendants possessed actual knowledge of the false, misleading, or deceptive character of the information and omissions alleged herein.

237. Plaintiff The Berger Siblings Trust had no way of discerning that Defendants' representations were false or misleading, or otherwise learning of the facts and realities that Defendants failed to disclose concerning PHL. If plaintiff The Berger Siblings Trust was made aware of the material risk threatening the Berger Policy, it could have withdrawn the cash value of the Berger Policy in full or performed a 1035 exchange at any point prior to the Rehabilitation.

238. As a direct and proximate result of Defendants' deceptive and unfair trade practices, plaintiff The Berger Siblings Trust and Illinois Subclass members have suffered actual damages, including premiums and charges paid in reliance on Defendants' deceptive conduct; the lost value or benefits of its Phoenix Products in excess of the Payment Limits that it would have preserved had the truth been disclosed; and the value of the surrender, withdrawal, exchange, replacement, and other policyholder options it lost.

**COUNT VIII**

**Violations of Connecticut Unfair Trade Practices Act,**
**Connecticut General Statutes §42-110(a) *et seq*.,**
**Against Golden Gate and Nassau**

239. Plaintiffs Williams and Rottkamp re-allege and incorporate herein by reference all foregoing and subsequent allegations.

240. Plaintiffs Williams and Rottkamp bring this cause of action on behalf of the Connecticut Subclass.

241. Under the Connecticut Unfair Trade Practices Act ("CUTPA") "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a).

242. Plaintiff Williams is a "person" within the meaning of Conn. Gen. Stat. §42-110a(3).

243. Plaintiff Rottkamp is a "person" within the meaning of Conn. Gen. Stat. §42-110a(3).

244. Golden Gate and Nassau are each a "person," "corporation," "incorporated association," or "other legal entity" within the meaning of Conn. Gen. Stat. §42-110a(3).

245. Golden Gate and Nassau's activities described herein, including administering plaintiffs Williams' and Rottkamp's, and Connecticut Subclass members', Phoenix Products, constitute "trade" and "commerce" within the State of Connecticut under Conn. Gen. Stat. §42-110a(4). Golden Gate engaged in this trade and commerce directly and through Nassau, which it owned and controlled, and through PHL, a Connecticut insurer it owned and controlled through its affiliated funds.

246. Golden Gate and Nassau's misconduct, collectively and individually, and as described herein, violates CUTPA.

247. Golden Gate and Nassau engaged in unfair or deceptive acts or practices in the business of insurance in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. §§38a-815 and 38a-816.

248. These CUIPA violations include, but are not limited to, making or causing misrepresentations or omissions, or providing false information, about the Phoenix Products in violation of Conn. Gen. Stat. §38a-816(1)-(2), and making or causing false or misleading financial-condition statements concerning PHL in violation of Conn. Gen. Stat. §38a-816(5).

249. Golden Gate and Nassau's misconduct also offended the public policy implicit in Connecticut's Insurance Holding Company Act, including Conn. Gen. Stat. §38a-136, which requires, *inter alia*, transactions within an insurance holding-company system to be fair and reasonable, properly allocated under customary insurance accounting practices, and consistent with reasonable insurer surplus in relation to liabilities and financial needs. Defendants' affiliate-captive transactions, XOL treatment, and related-party transfers violated those safeguards by making PHL appear adequately capitalized while concealing that its reported surplus depended on circular transactions with affiliates that were not arm's length and not supported by legitimate assets. From October 15, 2019, until present Concord Re and Palisado Re did not have sufficient funds actually available to pay the policyholder liabilities they assumed from PHL.

250. Each at-issue communication, misrepresentation, and/or omission related to the Phoenix Products, or the payment of premiums or charges by plaintiffs Williams and Rottkamp

and Connecticut Subclass members also constitutes a separate violation of the Connecticut Unfair Trade Practices Act.

251. Golden Gate and Nassau engaged in materially misleading conduct, among other courses of conduct, constituting deceptive trade practices in violation of CUTPA, including repeated communications to plaintiffs Williams and Rottkamp and Connecticut Subclass members through periodic policy statements, premium due notices, deposit reminders, statements of value, annual policy communications, and related communications that omitted material information about PHL's financial condition, claims-paying ability, and the increased risk to plaintiffs Williams' and Rottkamp's, and Connecticut Subclass members', Phoenix Products, and the collection or retention of premiums, charges, servicing fees, and other revenues as a result of those communications and omissions.

252. Golden Gate and Nassau's conduct had the capacity and tendency to influence plaintiffs Williams' and Rottkamp's, and Connecticut Subclass members', decisions or conduct because the communications described above conveyed business as usual while omitting facts material to whether plaintiffs Williams and Rottkamp, and Connecticut Subclass members, should continue paying premiums and charges, maintain their Phoenix Products, or surrender, withdraw, exchange, replace, or otherwise protect their policy and contract values.

253. The acts and practices alleged herein were repeated, affected a broad group of policyholders and annuity holders, and implicated the public interest in fair and truthful communications in the servicing and administration of life insurance policies and annuity contracts.

254. As a result of Golden Gate and Nassau's violations of CUTPA and CUIPA, plaintiffs Williams and Rottkamp, and Connecticut Subclass members, suffered ascertainable losses of money or property, as discussed herein.

255. Golden Gate and Nassau's deceptive acts and practices, as described herein, offend public policy and constitute immoral, unethical, oppressive, and unscrupulous conduct. The at-issue life insurance policies and annuity contracts are delicate financial instruments relied upon by

millions of Americans in order to provide retirement and post-mortem income and support for oneself and/or one's family members and other loved ones.

256. Golden Gate and Nassau's deceptive acts and practices were carried out knowingly and in willful, wanton, and reckless indifference to the rights of plaintiffs Williams and Rottkamp, and Connecticut Subclass members.

257. As a direct and proximate result of these CUTPA violations, Golden Gate and Nassau are jointly and severally liable for the foreseeable and ascertainable losses suffered by plaintiffs Williams and Rottkamp, and Connecticut Subclass members.

258. Accordingly, plaintiffs Williams and Rottkamp seek actual economic damages, punitive damages, attorneys' fees, costs of this action, all appropriate penalties and fees, and any other relief that the Court may deem just and proper.

## VIII. PRAYER FOR RELIEF

259. Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order finding in favor of Plaintiffs on all counts asserted herein;

(b) For actual damages Plaintiffs suffered;

(c) For equitable relief, including the imposition of a constructive trust or other equitable remedies such as restitution, an accounting, or disgorgement of ill-gotten gains;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order awarding reasonable attorneys' fees and expenses and costs of suit; and

(g) Grant any other relief as the Court deems appropriate to remedy the violations.

## IX. DEMAND FOR JURY TRIAL

260. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all the claims asserted in this Complaint so triable.

DATED: October 23, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN (*pro hac vice to be filed*)
VINCENT M. SERRA (#243155)
SKYLER J. SANDS (*pro hac vice to be filed*)

*/s/ Vincent M. Serra*
VINCENT M. SERRA

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vserra@rgrdlaw.com
ssands@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (#213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

EDWARD STONE LAW P.C.
EDWARD S. STONE (*pro hac vice to be filed*)
700 Canal Street, 1st Floor
Stamford, CT 06902
Telephone: 203/504-8425
203/348-8477 (fax)
eddie@edwardstonelaw.com

*Attorneys for Plaintiffs*