# EXHIBIT A

# When Wall Street's Insurance Playbook Goes Wrong

bloomberg.com/features/2025-america-insurance-part-2

Alexandre Rajbhandari

November 17, 2025 at 5:00 PM EST
Updated on November 18, 2025 at 12:35 PM EST



**Almost a decade after a private equity firm began reshaping a struggling life insurer, authorities are grappling with a $2.2 billion shortfall. Policyholders fear life-changing losses.**

When Jenny Nappo lost her husband Jimmy to a long battle with cancer, she didn't imagine that her ordeal was just beginning.

For 17 years, the couple faithfully paid life insurance premiums so if tragedy ever struck, the stay-at-home mom would stay afloat and their daughters could afford college. The policy they bought as newlyweds promised a $2 million safety net.

But since Jimmy died at age 53, Jenny has received only $300,000 — and the collapse of her private equity-owned insurer makes it unclear whether she'll ever see the rest.

PHL Variable Insurance Co. is a cautionary tale of what can go wrong as Wall Street firms expand into life insurance and take over obligations to American savers. Since the insurer sold policies to the Nappo family and thousands of others, it has unraveled into a shell of itself. A few weeks after Jimmy's death, the firm's deteriorating finances prompted a regulator in its home state of Connecticut to place it in rehabilitation and limit payouts — effectively withholding nest eggs worth at least $400 million.

Authorities have since estimated the firm faces a $2.2 billion capital shortfall.



**Jenny Nappo is uncertain if her family will ever see its full investment after the collapse of PHL.**
*Photographer: Rachel Bujalski for Bloomberg*

"My husband died feeling like we had done the right thing," Nappo said. "We did what we were supposed to do. And now suddenly, they're not holding up their end of the bargain."

Private equity firms such as PHL's owner, Golden Gate Capital, have rapidly bought up a chunk of the US life insurance industry in one of Wall Street's biggest trades of the past decade. Many are reshaping their insurers' balance sheets — holding less capital, shifting liabilities offshore and buying more complex or potentially illiquid assets, such as private credit and asset-backed securities, that are the forte of their Wall Street owners.

This story is part of a Bloomberg series showing how those strategies have exploded in popularity — and their potential ramifications.

The Rewritten Retirement Promise




*Next installments in the series coming this week*

In PHL's case, the saga is laid out in state court filings in Connecticut, where local insurance officials have been updating a judge for more than a year on their examination of what happened and what's left for policyholders. Those documents present a detailed chronology of the life insurer after its acquisition by an investment firm. No one has been accused of breaking the law.

Golden Gate is known in the restaurant world for reshaping Red Lobster and selling it in 2020, three years before the chain tumbled into bankruptcy.

When the private equity firm's new insurance arm, Nassau Financial Group, agreed to buy PHL in 2015, the life insurer was already facing a variety of challenges.

They included outside investors' purchases of customers' policies, which has bedeviled the industry and effectively rendered the prior management team's actuarial assumptions obsolete.

But court documents also reveal the role that financial re-engineering played in the life insurer's fate. The moves included setting up two "captive" reinsurers over time that together promised to cover any future shortfalls.

In 2021, Golden Gate executives handed PHL additional capital and won a state regulator's blessing to break off the business into a standalone entity. Yet PHL's deterioration persisted, court records show. By early 2023, authorities ramped up oversight. And last year they sought a full accounting, digging into the reinsurers to size up the shortfall.

### PHL Handed Off Risks to Affiliated Reinsurers

Deals bolstered PHL's balance sheet, but kept liabilities in the group




*Source: Year-end regulatory filings from PHL Variable Insurance Co.*
*Note: Reinsurance figures are for reserve credit taken and modified co-insurance, combining general and separate accounts.*

“We remain committed to supporting the Connecticut Insurance Department in its efforts to serve PHL policyholders,” a spokesperson for Nassau said in a statement that didn’t address questions for this story. Golden Gate declined to comment.

Nappo and hundreds of others may soon learn how much of their benefits they might collect.

“I’m beyond perplexed as to how this company’s kind of woeful financial position wasn’t caught far sooner by state regulators,” said John Williams, who owns a security company in Hartford, Connecticut, and has an annuity with PHL. “It blows my mind.”

PHL has long reflected its times.

When Abraham Lincoln needed insurance, he turned to one of its earliest ancestors. The company, founded in 1851 as American Temperance Life Insurance Co., initially catered to teetotalers like the alcohol-wary president.

As the US rumbled toward Civil War, the abstinence movement faltered and the firm became Phoenix Mutual Life Insurance Co., insuring drinkers, too. When mergers swept through the industry more than a century later, Phoenix joined in. As investors snapped up insurance stocks in the early 2000s, Phoenix went public. And when a flurry of life insurers sold themselves to private equity mavens, so did Phoenix.

> ***“I’m beyond perplexed as to how this company’s kind of woeful financial position wasn’t caught far sooner by state regulators”***

The years after the 2008 financial crisis marked a nadir for many life insurers. Their portfolios lost money as the market slumped, then took another hit as the Federal Reserve tried to revive the economy with rock-bottom interest rates, crimping bond returns. As Phoenix adjusted its accounting and posted losses in 2015, the stock tumbled more than 80% in less than nine months.

That’s when Golden Gate’s Nassau pounced.

The expansion was part of a broad push from private equity firms to replicate what Apollo Global Management Inc. was pursuing with its own life insurer, Athene. Its executives were seeking to sell more coverage, boost returns from assets and use cashflows to fund deals arranged by the firm’s Wall Street investment arm.

As part of its deal, Nassau injected $100 million of fresh capital into Phoenix, with Nassau’s chief executive officer publicly predicting that would help “accelerate the company’s turnaround, bolster its financial strength and ratings, and benefit policyholders.”

“You would’ve thought, ‘Oh my God, this company is bulletproof for the next 300 years,’ based on the way they were painting it,” said Williams, the business owner. “They were really pumping that.”

Persuaded, he rolled his other life insurance savings into an annuity at PHL, which was part of Phoenix, in 2018.

Late the next year, according to the court documents, PHL stopped selling new life policies and annuities so that it could focus on fulfilling existing obligations.

Behind the scenes, PHL’s recurring losses were dragging on Nassau, according to an analysis at the time by S&P Global Ratings.

At its core, life insurance is based on estimates. Figure out how long a group of customers will live on average, and how many of them will keep paying their policies until they die. Add up the money collected from them, invest wisely and make payouts to those who keep up with premiums until they die.

PHL's business went wrong at every turn.



**PHL's Hartford, Connecticut, headquarters** *Photographer: Ike Abakah for Bloomberg*

Usually, insurers catch a break if customers walk away and forfeit what they already put in. Instead, many PHL policyholders sold their policies to investors who kept paying premiums to later collect the benefits. The twist, known as "stranger-originated life insurance," or STOLI, has stung many insurers.

Then in 2020, the pandemic shortened life expectancies.

And ultimately there was another problem, Connecticut's insurance regulator wrote in a court filing last year: "investments that did not perform as projected."

The long-simmering pressures on PHL were hardly secret within financial circles. S&P downgraded the insurer's credit five notches in 2019, to CCC+ from BB, citing a $100 million decline in capital adequacy.

In the same decision, S&P also assigned a negative outlook to other Nassau companies, expressing concerns about risk management and their exposure to PHL.

Amid worries that PHL's losses might propagate, regulators in neighboring New York intervened. The Department of Financial Services, which oversaw the Nassau entity with the most capital, prohibited it from contributing to PHL, according to an S&P note at the time. The New York agency didn't respond to requests for comment.

In late 2019, Nassau took dramatic steps. It put PHL in run-off mode and embarked on a series of transactions that re-engineered the unit's balance sheet — starting with buying reinsurance.

Traditionally, insurers bought reinsurance from third parties — paying outsiders to share potential burdens. But this century, a variation known as captive reinsurance has come into vogue. The idea is simple: An insurer sets up its own reinsurer and buys coverage from it to get balance-sheet relief. However, that can eliminate the outsider perspectives and checks that third-party reinsurers provide.

For PHL, executives created a new captive called Concord Re, which promised to handle any obligations that PHL and its existing reinsurers couldn't manage, records show. That unit, in turn, shared some of its liabilities with another captive reinsurer.

Overall, PHL's various reinsurance programs totaled almost $5.3 billion at the end of 2022. The majority — $3.5 billion — stemmed from its dealings with Concord Re.




That helped alleviate the regulatory pressure on PHL. But its capital turned negative in 2023, prompting Connecticut's insurance regulator to place the firm under closer supervision. As the situation worsened, the firm entered a court-supervised process known as rehabilitation, which aims to salvage struggling insurers.

By May last year, Connecticut's regulator estimated PHL and its captives faced a $900 million hole. Still, authorities said they needed more information on the reinsurers. They took a deeper look, updated actuarial assumptions, lifted a special accounting treatment and within six months presented a new estimate to the court.

That time, the estimated shortfall exceeded $2 billion.

"Hundreds of millions of dollars was moved around in a circle to give the illusion that PHL Variable was OK when it wasn't," said Edward Stone, a lawyer representing some policyholders in the rehabilitation, echoing arguments he has made to the court. "That's the kind of thing that I think puts policyholders at great risk and creates systemic risk for the life and annuity business."

PHL's modernized investment strategy failed to head off its unraveling. Taking a page out of industry's new playbook, PHL ultimately parked about 30% of its assets in less liquid investments — such as structured notes and other alternative products — including those issued by Nassau's asset management arm, court filings show.

In PHL's audited statements for 2024, some of the firm's investments in Nassau's collateralized loan obligations were worth a third less than their face value, with some other books down by more than half, according to the filings.

In 2018, PHL said its holding company committed to authorities that it would keep the insurer's risk-adjusted capital ratio — a measure of financial strength — above 200% until 2023. But that agreement stopped appearing in public documentation as early as 2021, when Golden Gate made a capital contribution and moved PHL out of its stronger Nassau business, which has $25.6 billion of assets.

The pledge was important to PHL's solvency and policyholders, who didn't notice its disappearance, Stone said.

> ***"Hundreds of millions of dollars was moved around in a circle to give the illusion that PHL Variable was OK when it wasn't"***

Despite requests by the Connecticut Insurance Department when the rehabilitation proceedings started, Golden Gate declined to contribute capital to help shore up PHL's finances, according to a person with knowledge of the situation, who asked not to be identified discussing the private talks.

Connecticut Insurance Commissioner Andrew Mais said the rehabilitation proceedings seek to maximize the firm's assets in the interest of all policyholders.

"We recognize that the moratorium has placed financial burdens on certain policyholders," he said.

Golden Gate's Nassau is still getting payments from PHL. Despite being in rehabilitation, PHL sends millions of dollars to the Nassau companies for administrative and asset management services. The regulator has also allowed it to pay commissions to agents who sold PHL policies so they can keep helping those customers.

Recently, PHL's rehabilitator said it hopes to recover funds from undisclosed third parties, either through settlements or litigation. It's also looking to sell parts of PHL, and has said it hopes to come up with a formal rehabilitation plan soon.

Meanwhile, policyholders say they're in limbo. To avoid a "run-on-the-bank" scenario, the Connecticut regulator enforced a moratorium that capped policyholders' benefits at $250,000 or $300,000, depending on the policies. But life insurance clients still need to make payments to keep policies alive.

That means spending more to chase a payout that's uncertain.

One of Stone's clients, SWS Holdings, holds two policies that were supposed to pay out $18 million. It has to fork over more than $671,000 every year in premiums to PHL.

In a recent gesture toward policyholders, Connecticut's insurance regulator said it was working on potential adjustments to the moratorium to reduce or stop requiring future premiums for some clients, or to let others access some of their funds. A hearing on those amendments was held last month.

The moratorium provides exceptions, and a committee has been set up to pay claims when policyholders can prove financial hardship. The program has allowed 191 payments for a total of about $5.4 million.

But Jenny Nappo, who spent weeks working on her application for that program, received a letter saying her request was denied.

"It seemed to be sort of my last hope," she said. "And they weren't interested."

*(Updates with recent hearing in fourth-to-last paragraph.)*